IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| INTERCON SOLUTIONS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | 12 C 6814 |
| | ) | |
| | ) | Judge Virginia M. Kendall |
| BASEL ACTION NETWORK and JAMES | ) | |
| PUCKETT, | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Intercon Solutions, Inc. is a California-based provider of e-recycling services that operates an e-recycling facility in Illinois. Defendant Basel Action Network ("BAN") is a non-profit Seattle-based corporation that certifies businesses that provide e-recycling services. Intercon alleges that BAN and its founder and Executive Director, James Puckett ("Puckett") defamed and placed Intercon in a false light by falsely and publicly accusing it of shipping hazardous e-Waste to China and Hong Kong. In addition to its defamation and false light claims, Intercon seeks an injunction restraining the Defendants from: (1) disseminating Intercon's confidential information; (2) stating that Intercon engages in illegal and unethical business practices; and (3) stating that Intercon was in possession of and shipped hazardous waste to China and Hong Kong. Defendants raise various affirmative defenses in their Amended Answer to Intercon's Complaint, including lack of personal jurisdiction, improper venue, unclean hands, and substantial truth. Defendants also assert that Intercon's Complaint is barred by Illinois and Washington anti-SLAPP ("Strategic Lawsuits Against Public Participation") provisions and the First Amendment of the United States Constitution under the *Noerr-Pennington* doctrine. BAN

has filed a Counterclaim seeking a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, that Intercon exports waste to China contrary to its representations to the public and that BAN's decision to deny e-Stewards certification to Intercon Solutions was justified.

The following Motions are before the Court: (1) Defendants' Motion to Dismiss Intercon's Complaint pursuant to the Washington Anti-SLAPP Act, RCW 4.24.510; (2) Defendants' Special Motion to Strike Intercon's claims, also pursuant to the Washington Anti-SLAPP Act, RCW 4.24.525; (3) Defendants' Motion for Judgment on the Pleadings pursuant to Federal Rule of Civil Procedure 12(c); (4) Intercon's Motion to Dismiss, or in the alternative, Strike Defendants' affirmative defenses of improper venue, lack of personal jurisdiction, and unclean hands; and (5) Intercon's Motion to Strike and/or Dismiss BAN's Counterclaim. For the reasons stated herein, Defendants' Special Motion to Strike pursuant to RCW 4.24.525 and Motion for Judgment on the Pleadings are denied. Defendants' Motion to Dismiss pursuant to RCW 4.24.510 is granted in part and denied in part. Intercon's Motions to Strike Defendants' First and Second Affirmative Defenses and to Dismiss BAN's Counterclaim are granted. Intercon's Motion to Strike Defendants' Fourth Affirmative Defense is denied.

## BACKGROUND

Intercon is a California-based corporation that is in the business of providing electronic recycling ("e-recycling") services. (Complaint, ¶ 1.) In the e-recycling business, companies obtain certifications of compliance with certain industry standards upon which some customers rely. (*Id.*) BAN is a non-profit corporation that certifies businesses that provide e-recycling services. (*Id.* ¶ 2.) Intercon retained BAN to organize an audit on Intercon's business so that Intercon could obtain e-Stewards certification, a certification offered by BAN to companies that

provide e-recycling services. (*Id.* ¶ 5.) At the conclusion of its audit, BAN decided not to certify Intercon to the e-Stewards standard. (*Id.* ¶ 15.)

Intercon alleges that during the audit, BAN abused its access to confidential information provided by Intercon by engaging in unlawful surveillance of Intercon's premises. (*Id.* ¶ 6.) Intercon also alleges that after denying it the e-Stewards certification, BAN went on to state publicly – and falsely – that there was substantial evidence that Intercon shipped two containers of illegal and hazardous materials to Hong Kong and China. (*Id.* ¶ 7.) According to Intercon, BAN wrongly concluded and made false public accusations that two containers parked on Intercon's premises contained hazardous e-Waste materials, that Intercon owned the supposedly hazardous e-Waste held within the containers, and that Intercon shipped the containers with hazardous material to China and Hong Kong. (*Id.*)

Specifically, Intercon alleges that on or about June 28, 2011, James Puckett ("Puckett), the founder and Executive Director of BAN, falsely stated in a letter posted on BAN's website that "there is substantial evidence that during the period of time that Intercon Solutions was contracted to be certified, Intercon Solutions exported hazardous electronic waste to China … in violation of the e-Stewards Standard for Responsible Recycling and Reuse of Waste." (*Id.* ¶ 10.) The letter further states that "there is substantial reason to believe that such exports may violate Public Act 095-0959 … of the State of Illinois, the Federal CRT Rule, … as well as the waste importation laws of Hong Kong/China." (*Id.*) Intercon alleges that this letter was sent to selected news media, John Fraser of SAI Global, John Lingelbach of R2 Solutions, and remained accessible on the Internet. (*Id.* ¶ 11.) Intercon also asserts that BAN attached to this letter its purported "Evidentiary Report of Potential e-Stewards Violation" (the "Evidentiary Report"). (*Id.* ¶ 11.) According to Intercon, the Evidentiary Report falsely accuses Intercon of illegally

shipping containers containing e-Waste to China and Hong Kong in violation of U.S. and Chinese law. (*Id.* ¶¶ 12-13.) Intercon alleges that the Evidentiary Report also implies that BAN had evidence and facts to support its accusations against Intercon, when in fact BAN had no such evidence or facts. (*Id.* ¶ 12.) The Evidentiary Report, like the letter, was publicized to selected news media, John Fraser, John Lingelbach, and remains readily accessible on the Internet. (*Id.* ¶ 14.) Next, Intercon alleges that on or about July 5, 2011, BAN posted on its website, www.ban.org, another defamatory press release falsely stating that that BAN denied Intercon the e-Stewards certification based on " 'compelling evidence' that Intercon had been exporting hazardous waste to China in violation of the United Nation's Basel Convention. (*Id.* ¶ 15.) In a subsequent press release, Puckett stated, in what Intercon alleges to be an obvious reference to Intercon, that "[i]t is very sad that many e-Waste recycling companies continue to pose as 'responsible recyclers' while they continue to export toxic waste …. In this case, we can take some satisfaction that our e-Stewards Certification screening methods and audits caught what BAN has every reason to believe is a violator." (*Id.* ¶ 16.) Intercon further alleges that BAN issued another press release on August 4, 2011, in which Puckett falsely stated that one of Intercon's containers "was known to contain hazardous waste." (*Id.* ¶ 17.)

## DISCUSSION

### I.     Defendants' Anti-SLAPP Defenses

Anti-SLAPP statutes are intended to "address lawsuits brought primarily to chill the valid exercise of the constitutional rights of free speech and petition for redress of grievances." RCW 4.24.525, Note 1(a). "The term 'SLAPP,' which stands for 'Strategic Lawsuit Against Public Participation,' was coined by two professors at the University of Denver, George W. Pring and Penelope Canan, who conducted the seminal study on this type of lawsuit." *Sandholm v.*

*Kuecker*, 962 N.E.2d 418, 427 (Ill. 2012) (citing George W. Pring and Penelope Canan, *"Strategic Lawsuits Against Public Participation" ("SLAPPs"): An Introduction for Bench, Bar, and Bystanders*, 12 Bridgeport L. Rev. 937 (1992)). SLAPPs "masquerade as ordinary lawsuits" and may include myriad causes of action, including defamation, interference with contractual rights or prospective economic advantage, and malicious prosecution. *See* Kathryn W. Tate, *California's Anti-SLAPP Legislation: A Summary of and Commentary on Its Operation and Scope*, 33 Loy. L.A. L.Rev. 801, 804-05 (2000). The motive for filing a SLAPP is not to win but rather to chill the defendant's speech or protest activity and discourage opposition by others through delay, expense, and distraction. *See* John C. Barker, *Common-Law and Statutory Solutions to the Problem of SLAPPs*, 26 Loy. L.A. L.Rev. 395, 403-05 (1993). By forcing defendants to expend funds on litigation costs and attorney fees, the SLAPP plaintiff's goal of discouraging the defendant's protest activities are achieved through the ancillary effects of the lawsuit, not through an adjudication on the merits.[1] *See id.* at 406. Recognizing that imposing litigation costs rather than winning is a SLAPP plaintiff's primary motivation, several states have enacted "anti-SLAPP" legislation aimed at "provid[ing] for expedited judicial review, summary dismissal, and recovery of attorney fees for the party who has been 'SLAPPed.' " *Sandholm*, 962 N.E.2d at 428 (citations omitted).

Defendants offer two bases for dismissal pursuant to the Washington's Anti-SLAPP Act (the "Act"), RCW 4.24.500 *et seq.* First, Defendants assert they are immune from civil liability pursuant to RCW 4.24.510 because the communications that form the basis of Intercon's claims conveyed information to government agencies and concerned matters reasonably of concern to

---

[1] One commentator has observed that "defendants win eighty to ninety percent of all SLAPP suits litigated on the merits." Barker, 26 Loy. L.A. L.Rev. at 406.

those agencies. Second, Defendants argue that Intercon's claims against it should be stricken pursuant to RCW 4.24.525 because they arise from Defendants' actions involving public participation and Intercon cannot prove by clear and convincing evidence that it will prevail on its claims. Intercon contends, *inter alia*, that Illinois, not Washington law applies to BAN and Puckett's defenses in this case. The choice of law issue is a threshold matter the Court must address before engaging in further analysis of Defendants' anti-SLAPP defenses.

### A.     Washington Law Applies to BAN and Puckett's Anti-SLAPP Defenses

"A district court sitting in diversity applies the choice-of-law rules of the state in which the court sits." *Malone v. Corr. Corp. of Am.*, 553 F.3d 540, 543 (7th Cir. 2009); *see also Cook v. Winfrey*, 141 F.3d 322, 329 (7th Cir. 1998) (citations omitted). In Illinois, a choice-of-law determination is only necessary when there is a conflict of laws and the difference will affect the outcome of the case. *See Townsend v. Sears, Roebuck & Co.*, 879 N.E.2d 893, 901 (Ill. 2007) ("Each issue is to receive separate consideration if it is one which would be resolved differently under the local law rule of two or more of the potentially interested states.") (quoting Restatement (Second) of Conflicts of Laws § 145, cmt. d, at 417 (1971)).

Illinois's anti-SLAPP statute, the Illinois Citizen Participation Act (the "ICPA"), offers fewer protections than the Act. Specifically, the Act grants absolute civil immunity for certain communications to government agencies under Section 510 and conditional immunity under Section 525 for actions "involving public participation and petition." RCW 4.24.510, 4.24.525. The Act also contains a "special motion to strike" provision that allows for early adjudication of a plaintiff's claim on the merits. RCW 4.24.525(4)(a). By contrast, the ICPA grants only narrow conditional immunity and does not contain a special motion to strike provision. *See* 735 ILCS 110/1 *et seq*; *Sandholm*, 962 at 430 (reversing dismissal under the ICPA where "a plaintiff files

suit genuinely seeking relief for damages for the alleged defamation or intentionally tortious acts of defendant," explaining that "had the legislature intended to radically alter the common law by imposing a qualified privilege on defamation within the process of petitioning the government, it would have explicitly stated its intent to do so").  Because the scope of immunity offered under the ICPA and the Act is different, the Court must decide whether Illinois or Washington law applies.

The parties do not dispute that Illinois law governs Intercon's defamation and false light claims.  Defendants assert however that its defenses to those claims, to the extent they are inconsistent with Illinois law, are governed by Washington law.  In Illinois, courts generally use the "most significant contacts" test in resolving conflicts of law. *See Auto-Owners Ins. Co. v. Websolv Computing, Inc.*, 580 F.3d 543, 547 (7th Cir. 2009).  Illinois also follows the doctrine of *depecage*,[2] "which refers to the process of cutting up a case into individual issues, each subject to a separate choice-of-law analysis." *Townsend*, 879 N.E.2d at 901.  Under the doctrine of *depecage*, the issue of whether a statement is defamatory is distinct from the issue of whether that statement is privileged. *See Wilkow v. Forbes, Inc.*, 2000 WL 631344, at *5 (N.D. Ill. May 15, 2000), *aff'd,* 241 F.3d 552 (7th Cir. 2001); *see also Vantassell-Matin v. Nelson*, 741 F.Supp. 698, 704 (N.D. Ill. 1990) (Shadur, J.) (In the choice-of-law context, "the threshold question [of defamation] and the defenses are different issues and call for different analyses").

In determining which law to apply to defenses raised pursuant to anti-SLAPP statutes, courts have found the place where the allegedly tortious speech took place and the domicile of the speaker central to the choice-of-law analysis. *See, e.g., Chi v. Loyola Univ. Med. Ctr*, 787

---

[2] "*Depecage*" is a French word for "dismemberment." *See Boomsma v. Star Transp., Inc.*, 202 F.Supp.2d 869, 874 (E.D. Wis. 2002) (citing BLACK'S LAW DICTIONARY 448 (7th ed. 1999).

F.Supp.2d 797, 803 (N.D. Ill. 2011). This approach is based on a recognition that the purpose of an anti-SLAPP law is to encourage the exercise of free speech and that states have a strong interest in having their own anti-SLAPP law applied to the speech of their own citizens, at least when that speech is initiated within the state's borders. *See, e.g., id*; *Global Relief Found. v. New York Times Co.*, No. 01 C 8821, 2002 WL 31045394, at *10 (N.D. Ill. Sept. 11, 2002)). Thus although the place of injury is usually a central factor in determining what law governs a tort claim, this factor has been found to be "less important" in the anti-SLAPP context. *See, e.g., Chi*, 787 F.Supp.2d at 803. Thus courts applying Illinois choice-of-law principles in defamation cases where anti-SLAPP defenses are raised have held that the plaintiff's defamation claims and defendant's anti-SLAPP defenses need not be governed by the same state's laws. *See, e.g., Doctor's Data, Inc. v. Barrett*, No. 10 C 03795, 2011 WL 5903508, at *2 (N.D. Ill. Nov. 22, 2011) (Chang, J.) (applying Illinois law to plaintiff's defamation claim but North Carolina law to the North Carolina speaker's defenses); *Chi*, 787 F.Supp.2d at 803 (Kennelly, J.) (applying Arizona law to plaintiff's defamation claims but the ICPA to defendant's immunity claim because Defendants were citizens of Illinois and their alleged defamatory speech originated in Illinois); *Global Relief*, 2002 WL 31045394, at *11 (Coar, J.) (applying Illinois law to defamation claim but California law to anti-SLAPP defense, finding that "California has a great interest in determining how much protection to give California speakers …. Thus California law has the most significant relationship and the law of California will apply to defenses to defamation").

In this case, Defendants are citizens of the State of Washington and their allegedly defamatory speech, though eventually published in Illinois and on the Internet, originated in that state. As Washington has a strong interest in having its own anti-SLAPP legislation applied to

speech originating within its borders and made by its citizens, the Court will apply the Act in determining whether Defendants are immune from liability on Intercon's claims. *See, e.g., Chi*, 787 F.Supp.2d at 801-03 (applying ICPA to alleged defamatory statements drafted in Illinois but caused Plaintiff injury in Arizona, where it was read).

Relying on *Containment Techs. Grp., Inc. v. Am. Soc'y of Health Sys. Pharmacists*, No. 07-cv-0997-DFH-TAB, 2009 WL 838549, (S.D. Ind. Mar. 26, 2009), Intercon argues that Illinois, not Washington law should govern Defendants' anti-SLAPP defenses. In *Containment Techs. Group*, the court applied a "modified version of the 'most significant contacts' choice of law test" and concluded that a Maryland publisher was subject to Indiana's anti-SLAPP statute for its activities directed toward Indiana. *Id.* at *7. Intercon's reliance on *Containment Techs. Group* reflects either a cursory reading or basic misunderstanding of the court's opinion in that case. The *Containment Techs. Group* court applied Indiana choice of law principles. Unlike Illinois, Indiana has not adopted *depecage*. *Id*. In fact, the *Containment Techs. Group* court specifically acknowledged that a different outcome may result under Illinois choice-of-law principles:

> In *Simon v. United States*, the Indiana Supreme Court held on a certified question from the Third Circuit Court of Appeals that Indiana choice of law rules do not include depecage (application of different states' laws to different issues) …. Under a different conflict of laws regime, a different result might be reached, *see Global Relief v. New York Times Co.*, 2002 WL 31045394 (N.D. Ill. Sept. 11, 2002) (applying Illinois choice of law to find that defamation action proceeded under Illinois law but that defenses to defamation, namely anti-SLAPP, should be considered under California law), but in Indiana, the entire defamation cause of action is considered under the same state's of [sic] laws.

*Id. Containment Techs. Group* is therefore inapposite as it is undisputed that Illinois choice-of-law principles govern in this case.

## B.     Defendants' Motion to Pursuant to RCW 4.24.510

The Act was passed after the Washington legislature observed that SLAPPs are "filed against individuals or organizations on a substantive issue of some public interest or social significance" and "are designed to intimidate the exercise of First Amendment Rights." *Aronson v. Dog Eat Dog Films, Inc.*, 738 F.Supp.2d 1104, 1109 (W.D. Wash. 2010) (quoting Laws of 2002, ch. 232, § 1).   The legislature determined that "[i]t is in the public interest for citizens to participate in matters of public concern and provide information to public entities and other citizens on public issues that affect them without fear of reprisal through abuse of the judicial process." RCW 4.24.525, Note (1)(d).   The Act grants two forms of immunity: absolute immunity pursuant to RCW 4.24.510 ("Section 510") and conditional immunity pursuant to RCW 4.24.525 ("Section 525").

Defendants assert they are immune from liability under Section 510 of the Act because the alleged defamatory statements were communicated to government agencies and were of reasonable concern to those agencies.   Section 510 provides that "a person who communicates a complaint or information to any branch or agency of federal, state, or local government … is immune from civil liability for claims based upon the communication to the agency or organization regarding any matter reasonably of concern to that agency."[3] RCW 4.24.510.   The purpose of Section 510 is to encourage the reporting of potential wrongdoing to governmental authorities and "protect[] advocacy to the government, regardless of content or motive, so long as it is designed to have some effect on government decision making." *Bailey v. State*, 191 P.3d

---

[3] The statute formerly imposed upon the speaker the requirement of "good faith."   However this requirement was removed pursuant to the 2002 amendments. *See* RCW 4.24.510, Notes ("[The 2002 changes] amend[] Washington law to bring it in line with [Supreme] [C]ourt decisions [recognizing] that the United States Constitution protects advocacy to government, regardless of content or motive, so long as it is designed to have some effect on government decision making.")

1285, 1291 (Wash. App. Ct. 2008). Courts have found that Section 510 has not been superseded by Section 525. *See, e.g., Phoenix Trading*, 2011 WL 3158416, at * 5 (finding that "[t]he two provisions are complimentary") (citing, 2010 WL 4857022, at *4 n. 2). The defense of immunity set forth in Section 510 is an affirmative defense and thus the burden of proof is placed on the party asserting it. *See Magee v. Allen*, No. 59537-7-I, 2008 WL 1934843, at *2 (Wash. Ct. App. 2008). A person who prevails under Section 510 "is entitled to recover expenses and reasonable attorneys' fees incurred in establishing the defense and in addition shall recover statutory damages of ten thousand dollars." RCW 4.24.510. "Statutory damages are mandatory under the anti-SLAPP statute, but they 'may be denied if the court finds that the complaint or information was communicated in bad faith.' " *See Vanderpol v. Swinger*, No. C12-773 MJP, 2012 WL 3887161, at *2 (W.D. Wash. Aug. 8, 2012) (quoting RCW 4.24.510).

Section 510 by its terms imposes two requirements: (1) the statement must be reported to a "branch or agency of federal, state, or local government," and (2) the statement must be regarding a "matter reasonably of concern to that agency or organization." *See, e.g., Cornu-Labat v. Merred*, No. CV-11-0080-EFS, 2012 WL 1032866, at *3 (E.D. Wash. Mar. 27, 2012) (citing RCW 4.24.510). In this case, Intercon alleges that Defendants created a letter and Evidentiary Report falsely stating that there was substantial evidence that Intercon exported hazardous electronic waste to China in violation of Illinois and federal law. (Complaint, ¶¶ 9-13.) Intercon further alleges that Defendants defamed it by publishing these statements by: (1) posting the letter on BAN's website; (2) sending the letter to "selected news media"; John Lingelbach of R2 Solutions, which, according to Intercon, is a competitor e-recycling certification body; John Fraser of an organization known as "SAI Global," among others …." (*Id.* ¶ 11.) The last page of the letter, attached as Exhibit 1 to Intercon's Complaint, reveals that

Defendants also copied the Illinois State Environmental Protection Agency and the United States Environmental Protection Agency on this communication. (*See* Complaint, Ex. 1, p. 2.) Intercon further alleges that BAN posted on its website another defamatory press release stating that BAN had "compelling evidence" that Intercon had exported hazardous waste to China in violation of the United Nation's Basel Convention.[4] (Complaint, ¶ 15.) Finally, Intercon alleges Defendants released another press release on August 4, 2011 falsely stating that one of Intercon's containers "was known to contain hazardous waste." (*Id.* ¶ 17.)

To the extent Defendants communicated statements to the Illinois EPA and the U.S. EPA concerning Intercon's purported handling of hazardous waste, such statements are protected under the Act's grant of immunity under Section 510. Both entities qualify as agencies of either state or federal government. Furthermore, it cannot be seriously debated that statements concerning the shipment of hazardous waste in possible violation of Illinois and federal law are of reasonable concern to state and federal environmental agencies. Therefore, pursuant to Section 510, any statements made by Defendants to either the Illinois EPA or the U.S. EPA cannot form the basis for Intercon's defamation and false light claims.

However, the statements at issue in this case are alleged to have been made not only to state and federal agencies but also to "selected news media," a competitor e-recycling certification body, and an individual at an entity known as "SAI Global."[5] Intercon also alleges

---

[4] According to Defendants, the Basel Convention is a United Nations multilateral environmental agreement. (Def. Am. Answer, ¶ 45.) In Convention was amended in 1995 to ban the export of hazardous waste for any reason from rich to poor countries. (*Id.*) Defendants explain that this amendment has been legislatively adopted in most of the developed world, including the European Union, but has not been ratified and implemented by the United States. (*Id.*)

[5] Neither party has provided any detail regarding what exactly SAI Global is. Defendants, the party bearing the burden of proving the affirmative defense of immunity under Section 510, *see Magee*, 2008 WL 1934843, at *2, do not assert that SAI Global is a governmental agency.

that Defendants made their accusations available to the public by posting BAN's letter to Intercon, the Evidentiary Report, and defamatory press releases on BAN's publicly available website. (Complaint, ¶¶ 11, 14-15.) Defendants are not entitled to absolute immunity with respect to any harm Intercon alleges to have incurred as a result of these statements. The purpose of Section 510 is to "encourage the reporting of potential wrongdoing to *governmental* entities." *See Bailey*, 191 P.3d at 1290 (quoting *Gontmakher v. City of Bellevue*, 85 P.3d 926, 927 (Wash. Ct. App. 2004) (emphasis added); RCW 4.24.500 (setting forth the purpose of the Act and stating that "[t]he purpose of RCW 4.24.500 through 4.24.520 is to protect individuals who make good-faith reports to *appropriate governmental bodies*") (emphasis added).[6] Defendants do not point to a single case holding or even suggesting that statements made to private entities, a defendant's competitors, and media outlets are protected under the Act's absolute immunity provision. Nor do they draw the Court's attention to authority suggesting that a speaker can make otherwise defamatory statements to private entities and media organizations and successfully raise the shield of immunity under Section 510 by simply copying or forwarding the same communication to a government body. Courts applying the Act have limited the grant of immunity under Section 510 to situations where the communication is made to government agencies and officials. *See, e.g., Vanderpool*, 2012 WL 3887161, at *2 (counterdefendant immune from liability where counterplaintiff's allegations stemmed from counterdefendant's communication to a conservation entity that was administered at the local level by a Conservation District that was a governmental subdivision of the state and administered at the national level by the USDA's Farm Service Agency); *Cornu-Labat*, 2012

[6] As noted previously, the "good-faith" requirement was removed from RCW 4.24.510 pursuant to the 2002 amendments. RCW 4.24.500, which sets forth the purpose of the Act does not appear to have been modified when RCW 4.24.510 was amended to remove the good faith requirement.

WL 1032866, at *4 (defendant immune from liability where statements were communicated to school officials and police department because both were held to be government agencies); *Phoenix Trading*, 2011 WL 3158416, at *7 (defendants immune under RCW 4.24.510 for statements made to New York City Mayor Michael Bloomberg, other New York City officials, the United States Customs Agency, and an Assistant United States Attorney); *Young v. Bauer*, No. C05-5565 RBL/KLS, 2006 WL 3246150, at *2-3 (W.D. Wash. Nov. 6, 2006) (finding defendant immune from liability pursuant to RCW 4.24.510 where communication was made to local police authority and adding that "[defendant's] only other communication or contact with any person related to [the events she observed] was when she contacted Plaintiff's probation officer to attempt to locate Plaintiff").  Thus unlike Section 525, the Act's much broader immunity provision protecting any "action involving public participation and petition," including any statements made or submitted "in a place open to the public or a public forum in connection with an issue of public concern" and "any ... lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public concern," RWC 4.24.525(2)(d)-(e), the Act's grant of absolute immunity under Section 510 is plainly limited to "complaint[s] or information" communicated to a "branch or agency of federal, state, or local government ...." RCW 4.24.510.  Therefore, the Court finds that Defendants are not entitled to immunity under Section 510 for claims arising from Defendants' communications to the media, other private entities, or postings on BAN's publicly available website.

Accordingly, Defendants' Motion to Dismiss pursuant to Section 510 of the Act is granted to the extent that Intercon's defamation and false light claims arise from Defendants' alleged communications to the Illinois EPA and U.S. EPA but is denied to the extent Intercon's claims arise from Defendants' alleged communications to "selected news media," John Fraser,

John Lingelbach, any other nongovernmental entities, and Defendants' postings on BAN's publicly available website.

### C.     Defendants' Special Motion to Strike Pursuant to RCW 4.24.525

Section 525 of the Act immunizes defendants against "any claim that is based on an action involving public participation." RCW 4.24.525(4)(a).   Section 525 defines the phrase "action involving public participation" broadly:

> This section applies to any claim, however characterized, that is based on an action involving public participation and petition.   As used in this section, an "action involving public participation and petition includes:
>
> (a) Any oral statement made, or written statement or other document submitted, in a legislative, executive, or judicial proceeding or other governmental proceeding authorized by law;
>
> (b) Any oral statement made, or written statement or other document submitted, in connection with an issue under consideration or review by a legislative, executive, or judicial proceeding or other governmental proceeding authorized by law;
>
> (c) Any oral statement made, or written statement or other document submitted, that is reasonably likely to encourage or to enlist public participation in an effort to effect consideration or review or an issue in legislative, executive, or judicial proceeding or other governmental proceeding authorized by law;
>
> (d) Any oral statement made, or written statement or other document submitted, in a place open to the public or a public forum in connection with an issue of public concern; or
>
> (e) Any other lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public concern, or in furtherance of the exercise of the constitutional right of petition.

RCW 4.24.525(2)(a)-(e).

Immunity pursuant to Section 525 is conditional because a defendant must prevail on a "special motion to strike" in order to benefit from its protections. RCW 4.24.525(4).   In order to prevail on a special motion to strike, a defendant must show by a preponderance of the evidence

that the plaintiff's claim is based on an action of public participation and petition as defined in the Act. *See* RCW 4.24.525(4)(b). If this initial showing is made, the burden shifts to the plaintiff to establish by "clear and convincing evidence a probability of prevailing on its claim." *Id.* If the plaintiff meets that burden, the special motion to strike shall be denied. *See id.* In making a determination under Section 525, the court "shall consider pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based." *See* RCW 4.24.525(4)(c).

Defendants maintain they are immune from civil liability under Section 525 because the communications that form the basis for Intercon's Complaint constitute "actions involving public participation" and because Intercon cannot establish by clear and convincing evidence a probability of prevailing on its defamation and false light claims. Intercon argues that Defendants' Special Motion to Strike is untimely because it was filed more than sixty days after Defendants were served with the Complaint. Intercon also submits that Defendants' Motion asks the Court to consider materials outside the pleadings and decide its claims on the merits in a manner that circumvents the Federal Rules of Civil Procedure and the Local Rules of the Northern District of Illinois. The Court addresses each argument in turn.

### 1.    Defendants' Special Motion to Strike Is Not Time-Barred

RCW 4.24.525(5)(a) provides that a motion to strike "may be filed within sixty days of the service of the most recent complaint or, in the court's discretion, at any later time upon terms it deems proper." In this case, Puckett was served with the summons and Complaint on July 25, 2012. (Dkt. No. 1, ¶ 2.) BAN received a copy of the summons and Complaint on July 27, 2012. (*Id.*) The Defendants did not raise defenses under the anti-SLAPP statute in their initial Answer, which was filed August 31, 2012. Instead, Defendants' Answer asserted in general terms that (1)

"[t]he Complaint violates pertinent provisions of state law and state and federal constitutions;" (2) "[a]ll statements and comments made by Defendants concerning Plaintiff were made in good faith and concern matters which affect the interest of the general public. Therefore, Defendants' statements are protected by conditional privilege;" and (3) "[t]he Complaint is barred by the *Noerr-Pennington* doctrine. (Answer, Dkt. No. 9, ¶¶ 46, 49, 52.) Although Defendants eventually referenced the anti-SLAPP statute in their Amended Answer, which was filed September 28, 2012, (Dkt. No. 22, ¶ 52), they did not file a special motion to strike pursuant to Section 525 until November 6, 2012, over 100 days after being served with the Complaint. (*See* Dkt. No. 36.)

However, the statutory language makes clear that the 60-day limitation period is permissive, not mandatory. *See* RCW 4.24.525(5)(a) ("The special motion to strike *may* be filed within sixty days of the service of the most recent complaint *or, in the court's discretion, at any later time upon terms it deems proper.*") (emphasis added). In applying RCW 4.24.525(5)(a), courts have routinely exercised discretion and allowed filings outside of the 60-day period. *See, e.g., Fielder v. Sterling Park Homeowners Ass'n*, No. C11-1688RSM, 2012 WL 6114839, at *8 (W.D. Wash. Dec. 10, 2012) ("Despite Defendants' noticeable lack of excuse as to timeliness, the Court declines to decide the motion [filed over four months after service of the amended complaint] on a purely procedural deficiency."); *Davis v. Avvo, Inc.*, No. C11-1571RSM, 2012 WL 1067640, at *4 (W.D. Wash. Mar. 28, 2012) (permitting anti-SLAPP motion filed six months after filing of operative complaint but within sixty days of the case's transfer to federal court, finding that "the use of the term 'may' instead of the mandatory 'shall' means that this is not a firm deadline to be applied in all cases"); *Phoenix Trading*, 2011 WL 3158416, at *6 (allowing special motion to strike filed nine months after the filing of the complaint where

discovery had not yet been served and plaintiffs did not assert that they were prejudiced as a result of the filing of the motion outside of the 60-day period).

Here, Defendants raised defenses pursuant to the Act, disclosed to the Court and Intercon in the parties' Joint Status Report that it intended to pursue an affirmative defense under the Act, and informed the Court that they were prepared to this motion all within sixty days of this case being removed to federal court. Intercon was first made aware of Defendants' intention to raise defenses pursuant to the anti-SLAPP statute as early as September 28, 2012, when Defendants filed their Amended Answer to Intercon's Complaint. (Dkt. 22, ¶52.) On October 10, 2012, the parties filed a Joint Status Report in which Defendants alerted the Court and Intercon that it intended to pursue an affirmative defense under the Act. (Dkt. No. 24.) After restating its intention to bring a motion pursuant to the anti-SLAPP statute at the parties' initial status hearing, (*see* Transcript, 10/15/2012), Defendants filed this motion consistent with the Court's schedule.[7] Additionally, Defendants represent – and Intercon does not dispute – that the parties agreed to stay discovery shortly after the filing of this motion. Under these circumstances, the Court finds Defendants' motion timely filed.

### 2. Section 525 Conflicts with Federal Rules of Civil Procedure and Therefore Does Not Apply to a Federal Court Sitting in Diversity

Section 525 of the Act allows a court resolve a "special motion to strike" and dismiss a plaintiff's claim on a preliminary basis in a different manner than it would otherwise resolve a preliminary motion attacking the merits of a case under Rules 12 or 56. As explained above, once a defendant shows "by a preponderance of the evidence that the [plaintiff's] claim is based on an action of public participation and petition," the plaintiff's case can survive and move

---

[7] The Court directed Defendants to file their motion by November 6, 2012. (Dkt. No. 25.)

forward only if the plaintiff establishes by "clear and convincing" evidence a probability of prevailing on its claim. RCW 4.24.525(4)(b).  In resolving a special motion to strike, the court must consider the pleadings as well as "supporting and opposing affidavits stating the facts upon which the liability or defense is based." *See* RCW 4.24.525(4)(c).  According to Intercon, the special motion to strike cannot be applied by a federal court sitting in diversity because it attempts to circumvent the Federal Rules of Civil Procedure by asking the Court to review extrinsic evidence and declarations in a manner that is inconsistent with Rules 12 and 56.

The Seventh Circuit has not addressed whether special motions to strike pursuant to state anti-SLAPP laws conflict with the Federal Rules of Civil Procedure.  Relying on First and Ninth Circuit precedent, courts in this District have found such provisions substantive (as opposed to procedural) and therefore not in conflict with the Federal Rules. *See, e.g., Trudeau v. ConsumerAffairs.com, Inc.*, No. C 7193, 2011 WL 3898041, at *5 (N.D. Ill. Sep. 6, 2011); *Chi*, 787 F.Supp.2d at 808; *Global Relief*, 2002 WL 31045394, at *12.  In *3M Co. v. Boulter*, 842 F.Supp.2d 85, 102 (D.D.C. 2012), however, the United States District Court for the District of Columbia reached the opposite conclusion, finding that the Federal Rules of Civil Procedure preclude a federal court sitting in diversity from applying the D.C. Anti-SLAPP Act.  After thoroughly reviewing these cases and the precedent upon which they rely, the Court finds that the *Boulter* court's analysis correctly assesses the conflict between the Federal Rules of Civil Procedure and procedural devices in anti-SLAPP statutes that allow for preemptive resolution on the merits.  Applying that analysis to the facts of this case, the Court finds that Section 525 cannot be applied by a federal court sitting in diversity because it is in direct conflict with Federal Rules of Civil Procedure 12 and 56.

The framework for determining whether a Federal Rule of Civil Procedure conflicts with

state law was explained in *Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 130 S.Ct. 1431, 1437 (2010). Under *Shady Grove*, this Court must first "determine whether [the federal rule] answers the question in dispute." *Id.* (citing *Burlington N. R.R. Co. v. Woods*, 480 U.S. 1, 4-5 (1987)). In assessing their scope, the Federal Rules are not to be "narrowly construed in order to avoid a 'direct collision' with state law," but rather given their "plain meaning." *Walker v. Armco Steel Corp.*, 446 U.S. 740, 748-50 & n. 9 (1978); *see also Shady Grove*, 130 S.Ct. at 1442 (when construing a Federal Rule, "[w]e cannot contort its text, even to avert a collision with state law …."); 19 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 4508, 251 (2d ed. 1996) (stating that the Supreme Court has rejected any suggested that the Federal Rules of Civil Procedure should be "construed narrowly or distorted in order to avoid what otherwise would be a direct collision with state law")). If the federal rule answers or covers the question in dispute, the federal rule governs unless it is invalid. *Shady Grove*, 130 S.Ct. at 1437; *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 27 (1988). A state law need not be "perfectly coextensive and equally applicable" to a particular issue in order to be found in "direct collision" with federal law. *Stewart*, 487 U.S. at 26-27 n. 4. Rather, "where the applicability of a federal statute is at issue, [the "direct collision" language] expresses the requirement that the federal statute be sufficiently broad to cover the point in dispute." *Id.* (citing *Hanna*, 380 U.S. at 470). *Shady Grove* specifically instructs that a court need not "wade into *Erie's* murky waters" and determine whether a provision is procedural or substantive "unless the federal rule is inapplicable or invalid." *Shady Grove*, 130 S.Ct. at 1437 (citing *Hanna*, 380 U.S. 460, 469-71).

In *Shady Grove*, the Supreme Court applied this test in considering whether a New York law prohibiting class actions in suits seeking penalties for statutory minimum damages precluded a federal court sitting in diversity from entertaining a class action under Federal Rule of Civil

Procedure 23. *Id.* at 1436. Pursuant to an analysis under the *Erie* doctrine, the Court of Appeals for the Second Circuit had affirmed the district court's decision finding that the New York state rule was "substantive" and therefore must be applied in federal diversity actions. *Id.* The Supreme Court reversed, finding that the first step of the analysis should not have engaged the *Erie* doctrine but rather asked whether Rule 23 "answers the question in dispute." *Id.* That question, according to the majority, was "whether [the plaintiff's] suit may proceed as a class action."[8] *Id.* The Court first looked to the text and scope of Rule 23, which states that a class action "may be maintained" as long as certain prerequisites are met. *Id.* at 1438. The Court determined that Rule 23 by its terms created a categorical rule "entitling a plaintiff whose suit meets the specified criteria to pursue his claim as a class action." *Id.* at 1437. Finding that the Federal Rules provide for a "one-size-fits-all formula" for deciding whether a class action could be maintained in federal court, the Court held that the New York class action law could not govern in diversity actions because it "undeniably attempt[ed] to answer the same question" as Rule 23. *Id.* at 1437-39.

Observing that *Shady Grove* sets forth "clear guidance on how to analyze purported conflicts between Federal Rules of Civil Procedure and state laws," the *Boulter* court applied the same framework to determine whether certain procedural devices contained in the D.C. Anti-SLAPP Act conflicted with the Federal Rules of Civil Procedure. *See Boulter*, 842 F.Supp.2d at

---

[8] The portion of the *Shady Grove* opinion articulating this test enjoyed the assent of five justices, including Justice Stevens. However, Justice Stevens also wrote a concurring opinion in which he articulated the first step of the analysis slightly differently. According to Justice Stevens, the court must first ask "whether the scope of the federal rule is sufficiently broad to control the issue before the court, thereby leaving no room for the operation of seemingly conflicting state law." *Shady Grove*, 130 S.Ct. at 1451 (Stevens, J., concurring) (internal quotations omitted). This variation is of no consequence and would not change the outcome of the analysis in this case. For the reasons stated in this Opinion, the Court finds that Federal Rules of Civil Procedure 12 and 56 not only "answer the question in dispute" but are also "sufficiently broad to control the issue" of whether a federal court may, on a preliminary basis, adjudicate a plaintiff's claim on the merits while taking into consideration materials outside of the pleadings.

93-96. Like the Act, the D.C. anti-SLAPP law allowed defendants to file a "special motion to dismiss" any claim arising from an act in furtherance of the right of advocacy on issues of public interest. *See* D.C. St. § 16-5502(a). The D.C. law also set forth a process for evaluating the special motion to dismiss that is similar to the framework created under the Act. *See id.* In order to prevail on a special motion to dismiss, the moving party must "make [] a prima facie showing that the claim at issue arises from an act in furtherance of the right of advocacy on the issue of public interest." *Id.* at § 16-5502(b). If the moving party makes that showing, the "motion shall be granted unless the responding party demonstrates that the claim is likely to succeed on the merits."[9] *Id.*

Applying *Shady Grove*, the *Boulter* court first looked to whether the Federal Rules answered the question in dispute.[10] *See Boulter*, 842 F.Supp.2d at 96. The court found, upon thorough review of the history and purpose of Rule 12, that "Rule 12(d) links Rule 12 and 56 to provide the exclusive means for federal courts to use to rule upon a pretrial motion to adjudicate a case on the merits based on matters outside the complaint …." 842 F.Supp.2d at 98. After determining the scope of the Federal Rules, the *Boulter* court concluded that by "altering the procedure otherwise set forth in Rules 12 and 56 for determining a challenge to the merits of a plaintiff's claim and by setting a higher standard upon the plaintiff to avoid dismissal," the D.C. statute "squarely attempts to answer the same question that Rules 12 and 56 cover and, therefore, cannot be applied in a federal court sitting in diversity." *Id.* at 102.

---

[9] Unlike the Act, the D.C. Anti-SLAPP Act does not require that the plaintiff to demonstrate a probability of success on the merits by "clear and convincing evidence." *See* D.C. St. § 16-5502(b).

[10] Defendants urge that the *Shady Grove* analysis does not apply because that case concerned the elimination of a class action procedure and not a substantive state law. (*See* Def. Resp., Dkt. No. 55, p. 2, n. 2.) Defendants' position evidences a fundamental misunderstanding of *Shady Grove*. *Shady Grove* provides a framework for deciding whether a state statute conflicts with a Federal Rule of Civil Procedure that, in cases where a valid Federal Rule answers the question in dispute, avoids the substantive-versus-procedural inquiry altogether.

In this case, the question in dispute is whether a federal court may look to the pleadings and to materials outside of the pleadings and dismiss a plaintiff's claims on a preliminary basis as a result of the defendant's ability to show "that those claims are based on an action involving public participation and petition" and the plaintiff's subsequent failure to "establish by clear and convincing evidence a probability of prevailing" on its claims. RCW 4.24.525(4).

Federal Rule of Civil Procedure 12(d) sets forth the rules governing motions seeking adjudication on the merits based on matters outside of the pleadings:

> **(d) Result of Presenting Matters Outside the Pleadings.** If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all material that is pertinent to the motion.

Fed.R.Civ.P. 12(d). The language that currently appears in Rule 12(d) was added by amendment in 1946. *See* Fed.R.Civ.P. 12, 1946 Am., Notes to Subdivision (b).[11] The Advisory Committee Notes to the 1946 Amendment make clear that the purpose of Rule 12(d) was to "link[] Rule 12 with Rule 56 to provide the *exclusive* means for federal courts to use to rule upon a pretrial motion to adjudicate a case on the merits based on matters outside the complaint …." *Boulter*, 842 F.Supp.2d at 98 (emphasis added). The Advisory Committee notes provide:

> Rule 12(b)(6), permitting a motion to dismiss for failure of the complaint to state a claim on which relief can be granted, is substantially the same as the old demurrer for failure of a pleading to state a cause of action. Some courts have held that as the rule by its terms refers to statements in the complaint, extraneous matter on affidavits, depositions or otherwise, may not be introduced in support of the motion, or to resist it. On the other hand, in many cases the district courts have permitted the introduction of such material. When these cases have reached

[11] When added in 1946, language substantially identical to that of the current Rule 12(d) was placed at the end of Rules 12(b) and (c). Pursuant to a stylistic amendment made effective December 1, 2007, that language was consolidated and placed in a new Rule 12(d). *See Boulter*, , 842 F.Supp.2d at 97 n. 9 (citing *Tsai v. Maryland Aviation*, 306 Fed.Appx. 1, 4 n. 1 (4th Cir. 2008).

circuit courts of appeals in situations where the extraneous material so received shows that there is no genuine issue as to any material question of fact and that on the undisputed facts as disclosed by the affidavits or deposition, one party or the other is entitled to summary judgment as a matter of law, the circuit courts, properly enough, have been reluctant to dispose of the case merely on the face of the pleading, and in the interest of prompt disposition of the action have made a final disposition of it. In dealing with such situations, the Second Circuit has made the sound suggestion that *whatever its label or original basis, the motion may be treated as a motion for summary judgment and disposed as such.* [citations omitted.]

It has also been suggested that this practice could be justified on the ground that the federal rules permit "speaking" motions. The Committee entertains the view that on motion under Rule 12(b)(6) to dismiss for failure of the complaint to state a good claim, the trial court should have authority to permit the introduction of extraneous matter, such as may be offered on a motion for summary judgment, and if it does not exclude such matter the motion should then be treated as a motion for summary judgment and disposed of in a manner and on the conditions stated in Rule 56 relating to summary judgments, and of course, in such a situation, when the case reaches the circuit court of appeals, that court should treat the motion in the same way. *The Committee believes that such practice, however, should be tied to the summary judgment rule.* The term "speaking motion" is not mentioned in the rules, and if there is such a thing its limitations are undefined. *Where extraneous matter is received, by tying further proceedings to the summary judgment rule the courts have a definite basis in the rules for disposing of the motion.*

*The Committee emphasizes particularly the fact that the summary judgment rule does not permit a case to be disposed of by summary judgment on the merits on affidavits, which disclose a conflict on a material issue of fact, and unless this practice is tied to the summary judgment, rule, the extent to which a court, on the introduction of such extraneous matter, may resolve questions of fact on conflicting proof would be left uncertain.*

\*\*\*

In addition at the end of subdivision (b) makes it clear that on a motion under Rule 12(b)(6) extraneous material may not be considered if the court excludes it, but that *if the court does not exclude such material the motion shall be treated as a motion for summary judgment and disposed of as provided in Rule 56. It will also be observed that if a motion under Rule 12(b)(6) is thus converted into a summary judgment motion, the amendment insures that both parties shall be given a reasonable opportunity to submit affidavits and extraneous proofs to avoid taking a party by surprise through the conversion of the motion into a motion for summary judgment.* In this manner and to the extent this amendment

> regularizes the practice above described. As the courts are already dealing with cases in this way, *the effect of this amendment is really only to define the practice carefully and apply the requirements of the summary judgment rule in the disposition of the motion.*

Fed.R.Civ.P. 12 Adv. Comm. Note on 1946 Am. (emphasis added). As noted by the *Boulter* court, the transcripts of the Advisory Committee meetings adopting the 1946 Amendments further support this conclusion. *See* Proceedings of the Advisory Committee on Rules for Civil Procedure, Vol. 1, p. 153 (Mar. 25, 1946), *available at* http://www.uscourts.gov/uscourts/RulesAndPolicies/rules/Minutes/CV03-1946-min-Vol1.pdf (statement by Advisory Committee Chariman William D. Mitchell: mandatory language in Rule 12(d) was inserted in the amendment "because we don't want a judge deciding a case on affidavits other than in Rule 56."). The Advisory Committee Notes also make clear that the label assigned to a particular motion is of no consequence. Any motion requesting an adjudication on the merits based on extraneous material, "whatever its label or original basis," should be tied to the summary judgment rule. Fed.R.Civ.P. 12 Adv. Comm. Note on 1946 Am. Thus the fact that the Washington legislature has labeled the procedural device used to effectuate Section 525 of the Act a "special motion to strike" does not change the outcome of the analysis. Rule 12(d) is sufficiently broad to cover any situation the court is asked to consider the sufficiency of the plaintiff's claim based on materials outside of the pleadings, regardless of the label applied to the motion:

> Although the conversion provision in Rule 12[(d)] expressly applies only to the defense described in Rule 12(b)(6), it is not necessary that the moving party actually label the motion as one under that provision in order for it to be converted into a motion for summary judgment. *The element that triggers the conversion is a challenge to the sufficiency of the pleader's claim supported by extra-pleading material. As many cases recognized, it is not relevant how the defense actually is denominated in the motion.*

5C Wright & Miller § 1366 at 148 (emphasis added); *see also 3M*, 842 F.Supp.2d at 98, 103 (pretrial motion designed to adjudicate claims on the merits are to be decided in accordance with Rules 12 and 56 whether the motion is labeled a " 'motion to dismiss,' a 'motion for judgment on the pleadings,' a 'motion for summary judgment,' or 'speaking motion,' or anything else" because a motion's label "is immaterial, as the actual operation and effect of the motion, rather than its label, is what really matters").

In 2007, the Supreme Court reaffirmed the intent and purpose of Rule 12(d) as expressed by the Advisory Committee in 1946 – that the federal rules do not permit a district court to dismiss a complaint that is sufficiently plead with detailed and plausible factual allegations based upon the court's own assessment of the weight of disputed evidence or its finding that the claim is not likely to proceed. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563 n. 8 (2007) (citing Third and Eighth Circuit law for the "unobjectionable proposition that, when a complaint adequately states a claim, it may not be dismissed based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder"). Based on Supreme Court precedent, the 1946 amendments to the Federal Rules of Civil Procedure that added what is now Rule 12(d), and the contemporaneous Advisory Committee Notes explaining those amendments, it is clear that the Federal Rules of Civil Procedure do not allow a federal court to dismiss a case without a trial based upon its view of the merits of the case after considering matters outside of the pleadings, except in those instances where summary judgment is appropriate.

However, this is exactly what is asked of the district court when determining whether to grant a defendant's special motion to strike pursuant to Section 525 of the Act. Defendants' Special Motion to Strike asks this Court to evaluate hundreds of pages of material outside of the

pleadings, including declarations, affidavits, and exhibits, (*See* Dkt. Nos. 37-40, 51-59), and determine on a preliminary basis whether there is "clear and convincing evidence" that Intercon's claims are likely to succeed on the merits.  In this way, Section 525 of the Act alters the procedure otherwise set forth under Rule 12 and Rule 56 for determining a challenge to the merits of a plaintiff's claim.  First, Section 525 forces the a federal court to adjudicate claims on the merits and consider materials outside of the pleadings without tying the motion to the summary judgment rule.  Federal Rule of Civil Procedure 12(d).  Rule 12(d) grants the trial court discretion in determining whether to convert a Rule 12 motion to a motion for summary judgment and whether to accept materials outside of the pleadings. *See* Fed.R.Civ.P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to *and not excluded by the court* ….") (emphasis added).  The language of the Act, by contrast, is mandatory. *See* RCW 4.24.525(4)(c) ("In making a determination under (b) of this subsection, the court *shall* consider pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based.") (emphasis added).  In this way, the Federal "Rule's discretionary mode of operation unmistakably conflicts with the mandatory provision" of the Act. *Burlington Northern*, 480 U.S. at 6 (finding Alabama statute mandating penalty against litigants who appeal unsuccessfully to be in direct conflict with Federal Rule of Civil Procedure 38, which affords the district court discretion to award damages for frivolous appeals); *see also Affholder, Inc. v. Southern Rock, Inc.*, 746 F.2d 305, 308-09 (5th Cir. 1984) (mandatory affirmance penalty found to be in conflict with the Federal Rules and thus not applicable in federal diversity actions because (1) the discretionary mode of operation of the Federal Rule, compared to the mandatory operation of the Mississippi statute, and (2) the limited effect of the Federal Rule in penalizing only frivolous appeals or appeals interposed for the purpose of delay

compared to the effect of the Mississippi statute in penalizing every unsuccessful appeal regardless of merit).[12] Second, Section 525 imposing a heightened standard of proof upon the plaintiff to avoid dismissal. Once a defendant is able to show by a preponderance of the evidence that the claim against it is "based on an action involving public participation and petition," the plaintiff is required, at the preliminary stages of litigation and most likely without the benefit of meaningful discovery, to "establish by clear and convincing evidence a probability of prevailing on the claim" regardless of whether the plaintiff has otherwise "alleged facts that raise a plausible entitlement to relief" or "raised a genuine issue of material fact." The Advisory Committee Note to Rule 12 "make[] it clear that the last sentence of Rule 12[d] is not intended to permit the resolution of disputes on the basis of affidavits and other pretrial data when there is a material issue of fact that justifies a trial on the merits." Wright & Miller, 5C Fed. Prac. & Proc. Civ. § 1366. Accordingly, the Court finds that by placing a higher procedural burden on the plaintiff than is required to survive a motion for summary judgment under Rule 56,[13] Section 525 conflicts with Rule 12(d) and Rule 56 by restricting a plaintiff's "procedural right to maintain [an action]" established by the federal rules and therefore cannot be applied by a federal

---

[12] *Burlington* and *Affholder*, which was cited with approval by the Supreme Court, *see Burlington*, 480 U.S. at 7 ("We find the Fifth Circuit's analysis [in *Affholder*] persuasive."), suggest that the Act may also conflict with the Federal Rules because it mandates the award of attorneys' fees to whichever party prevails on a preliminary motion to strike. RCW 4.25.525(6)(a) ("The court shall award to a moving party who prevails, in part or in whole, on a special motion to strike …."). However, the Court need not decide the issue to reach its holding in this case.

[13] The Court also notes that the Act serves as a vehicle for parties to circumvent the local rules of this District governing summary judgment proceedings. Rule 56.1 is designed to "streamline the summary judgment process and 'assist the court by organizing evidence, identifying the disputed facts, and demonstrating precisely how each side propose[s] to prove a disputed fact with admissible evidence.' " *Renaldi v. Sears Roebuck & Co.*, No. 07 C 6057, 2001 WL 290374, at *2 (N.D. Ill. Mar. 21, 2001) (quoting *Markham v. White*, 172 F.3d 486, 490 (7th Cir. 1999). In this case, the parties have submitted hundreds of pages of materials to the court, including affidavits, declarations, and exhibits without even attempting to comply with Local Rule 56.1.

court sitting in diversity. *Shady Grove*, 130 S. Ct. at 1439 n. 4.[14]

### 3. Contrary Decisions

Defendants remind the Court that the analysis above reflects a minority view. Indeed both the First and Ninth Circuit have held that similar anti-SLAPP provisions do not conflict with the federal rules. *See Godin v. Schencks*, 629 F.3d 79 (1st Cir. 2010); *United States v. Lockheed Missiles & Space Co.*, 190 F.3d 963 (9th Cir. 1999). The Court respectfully disagrees with the First Circuit's analysis in *Godin* and finds *Lockheed* distinguishable in light of subsequent Ninth Circuit holdings.

In a pre-*Shady Grove* decision, the Ninth Circuit Court of Appeals concluded that while California's anti-SLAPP statute and the Federal Rules "do, in some respects, serve similar purposes" there is no "direct collision" between the two. *Lockheed*, 190 F.3d at 972-73. The *Lockheed* court reached its holding by determining that there was "no indication that Federal Rules of Civil Procedure 8, 12, or 56 were intended to 'occupy the field' with respect to pretrial procedures aimed at weeding out meritless claims." *Id.* Based on the 1946 amendments to Rule 12 and the Supreme Court's subsequent holdings in *Burlington Northern* and *Shady Grove*, the Court respectfully disagrees with this conclusion. As explained above, it is clear from the Advisory Committee Notes to the 1946 amendments to Rule 12 that Rules 12 and 56 *were* intended to provide the exclusive means for federal courts to use to rule upon a pretrial motion to adjudicate a case on the merits based on matters outside the complaint. Thus Rule 56 and Rule

---

[14] The Court recognizes certain federal statutes permit a party to file motions not mentioned or authorized by the Federal Rules. To the extent Defendants' may take this to suggest that Rules 12 and 56 were not meant to be the exclusive means for adjudicating claims on the merits before trial, the Court observes that this reasoning was rejected by the Supreme Court in *Shady Grove*, where the majority opinion pointed out that "Congress, unlike [a state or local government], has ultimate authority over the Federal Rules of Civil Procedure; it can create exceptions to an individual rule as it sees fit …." *Shady Grove*, 130 S.Ct. at 1438 (rejecting defendant's argument that Congress's decision to carve out certain federal claims from Rule 23's reach demonstrates that Rule 23 was not meant to apply to all claims).

56 answer the same question that is in dispute in this case and, pursuant to *Shady Grove* and *Burlington Northern*, cannot be applied by a federal court sitting in diversity.

Additionally, the Act, unlike the California anti-SLAPP statute, imposes on the plaintiff a heavier burden than the federal rules. Specifically, the California statute does not require the plaintiff to demonstrate a probability of prevailing on the merits "by clear and convincing evidence." *See* Cal.Code Civ. Proc. § 425.16(b)(1) ("A cause of action against a person arising from any act of that person in furtherance of the person's right to petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim."). Court's applying Section 525 of the Act have acknowledged that the addition of the "clear and convincing" language is not an insignificant variation from California law:

> One of the most crucial distinctions between the [Washington and California] statutes is that Washington's Anti-SLAPP law requires a responding party to demonstrate a likelihood of prevailing on his or her claim by *clear and convincing evidence*. The significance of this heightened evidentiary burden cannot be overstated. Whereas the California statute—which incorporates a mere "probability" standard—essentially creates an early opportunity for summary judgment, the Washington statute radically alters a plaintiff's burden of proof.

*Jones v. City of Yakima Police Dept.*, No. 12-CV-3005-TOR, 2012 WL 1899228, at *3 (E.D. Wash. May 24, 2012) (citations omitted); *see also AR Pillow Inc. v. Maxwell Payton, LLC*, No. , 2012 WL 6024765, at *2 ("Although the revised Act is modeled after California law, Washington applies a higher burden at the second stage.") (citing RCW 4.24.525(4)(b)).

Cases decided after *Lockheed* suggest that his difference would lead the Ninth Circuit to reach a different outcome if addressing a conflict between the Federal Rules and the Act. In, the court interpreted *Lockheed* to stand for the proposition that special motions to strike under

California's anti-SLAPP statute do not conflict with Federal Rules 12 and 56 because the two did not impose different standards on the plaintiff:

> *Lockheed*'s explanation for the lack of conflict makes sense only if one assumes that the standards for a special motion to strike are no different from those of the Federal Rules.  If they are no different, allowing a state-created vehicle to test the plaintiff's claim does not conflict with the Federal Rules and the various vehicles coexist peacefully.  *If, however, the standards are different, they will produce different outcomes, which means they conflict.*

*Rogers*, 57 F.Supp.2d at 982-84 (emphasis added).[15]  The court added that if "*Lockheed* applied a heavier burden on the plaintiff in a special motion to strike than imposed by the Federal Rules, *Lockheed*'s explanation for the lack of conflict is unsound," observing that "in federal court, a special motion to strike must be decided pursuant to the standards of Rule 12(b)(6) or Rule 56." *Id.* at 984.  As the *Boulter* court recognized, implicit in this court analysis is the conclusion that Rules 12 and 56 are sufficiently broad as to preempt conflicting state statutes. *Boulter*, 842 F.Supp.2d 85, 109 n. 19.  In *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832 (9th Cir. 2001), the Ninth Circuit found the California anti-SLAPP statute's discovery provisions in direct conflict with Rule 56 and therefore inapplicable in federal court. *See Metabolife*, 264 F.3d at 845-847.  In so holding, the Ninth Circuit approvingly cited *Rogers* and adopted its reasoning. *See id.* at 846. This Court agrees with the *Boulter* court's view that taken together, *Metabolife* and *Rogers* suggest that "the ultimate view of the Ninth Circuit is that the California Anti-SLAPP Statute can only be applied as long as it is consistent with the standards of Rules 12 and 56." *Id.*  Therefore, to the limited extent that Ninth Circuit law is consistent with this Court's approach, *Lockheed*'s analysis does not lead to the same result in this case.

The Court of Appeals for the First Circuit analyzed a similar provision contained in the

---

15

Maine anti-SLAPP statute. *Godin*, 629 F.3d at 90. Like the Act, the Maine statute "creates a special process by which a defendant may move to dismiss any claim that arises from the defendant's exercise of the right of petition under either the United States Constitution or the Constitution of Maine." *Id.* (citing Me.Rev.Stat. tit. 14, § 556). In determining whether proceedings under the statute conflicted with the Federal Rules of Civil Procedure, the court recognized the overlap between the state law and the federal rules:

> We do acknowledge the district court's concern about some differences in the mechanics, particularly as to the record on which the motion is evaluated. Whether the procedures outlined in [the anti-SLAPP statute] will in fact depart from those of Rule 12 and Rule 56 will depend on the particulars in a given case of the claim and defense. Some [motions pursuant to the anti-SLAPP statute], like Rule 12(b)(6) motions, will be resolved on the pleadings. In other cases, [the statute] will permit courts to look beyond the pleadings to affidavits and materials of record, as Rule 56 does. In this way, some [anti-SLAPP motions], depending on the particulars of a case, will be resolved just as summary judgment motions under Fed.R.Civ.P. 56 are.

*Godin*, 629 F.3d at 90. However, the *Godin* court's application of *Shady Grove* led it to conclude that the Maine anti-SLAPP law was " 'so intertwined with a state right or remedy that it functions to define the scope of the state-created right' " and therefore could not "be displaced by Rule 12(b)(6) or Rule 56. *Id.* (quoting *Shady Grove*, 130 S.Ct. at 1452 (Stevens, J., concurring). According to the *Godin* court, the Maine statute applied in federal court because it created substantive rights such as substantive legal defenses for a defendant, shifting burdens to a plaintiff, and because it substantively altered the type of harm that is actionable. *Id.* 89-90. This led the First Circuit to conclude that the federal rules were sufficiently broad to control proceedings under the anti-SLAPP statute because it is "not the province of either Rule 12 or 56 to supply substantive defenses or the elements of plaintiffs' proof to causes of action, state or federal." *Id.* at 89. The court also found that the scope of Rule 12 and Rule 56 was not so broad

because the Federal Rules "do not purport to apply only to suits challenging the defendants' exercise of their constitutional petitioning rights." *Id.* at 88.

This Court respectfully disagrees with this analysis. First, the proposition that an anti-SLAPP provision allowing for preliminary adjudication on the merits is not preempted by the federal rules because it "so intertwined with a state right or remedy" is drawn not from the majority opinion in *Shady Grove* but from Justice Stevens's concurrence. *See Shady Grove*, 130 S.Ct. at 1452 (Stevens, J., concurring). That notion was squarely rejected in Part II-C of the prevailing opinion, which, though it did not garner a majority, enjoyed the support of three justices. *See Shady Grove*, 130 S.Ct. at 1445 (plurality) (finding that the rule set forth by the Court in *Sibbach v. Wilson & Co.*, 312 U.S. 1 (1941) "leaves no room for special exemptions based on the function or purpose of a particular state rule"). Second, as the *Boulter* court recognized, the Supreme Court's opinion in *Shady Grove* makes clear that the Federal Rules of Civil Procedure apply "in all civil actions and proceedings in the United States district courts." *Boulter*, 842 F.Supp.2d at 103 (quoting *Shady Grove*, 130 S.Ct. at 1438). This Court is aware of no federal rule, statute, or case exempting proceedings where a party asserts defenses pursuant to an anti-SLAPP statute. Furthermore, under the framework set forth in *Shady Grove*, this Court need not "wade into *Erie's* murky waters" and determine whether the Act creates substantive rights because it has already determined that Rules 12 and 56 answer the questions in dispute.

The *Godin* court warned that "a serious question might be raised under the Rules Enabling Act" if "Rules 12(b)(6) and 56 were thought to preempt application" of the anti-SLAPP provisions at issue in that case. *Godin*, 629 F.3d at 90. To date, the Supreme Court has rejected every Rules Enabling Act challenge to a Federal Rule that has come before it. *See Shady Grove*, 130 S.Ct. at 1442. The *Godin* court did not give a reason or engage in any analysis

explainingwhy such a challenge might be successful for the first time in a case involving anti-SLAPP provisions seeking early preliminary adjudication on the merits. This Court agrees with *Boulter* that Rules 12(d) and 56 "fall squarely within the proper scope of the Rules Enabling Act." *Boulter*, 842 F.Supp.2d at 110 (citing *Burlington Northern*, 480 U.S. at 8; *Shady Grove*, 130 S.Ct. at 1442); *see also Shady Grove*, 130 S.Ct. at 1441 (citing pleading standards and the rules governing summary judgment as examples of rules that are procedural even though they "often embody policy preferences about the types of claims that should succeed ...."). The fact that application of Rules 12 and 56 affects parties' substantive rights does lead those rules to run afoul of the Rules Enabling Act. *See Shady Grove*, 130 S.Ct. at 1443 (noting that previous unsuccessful challenges to the Federal Rules under the Rules Enabling Act involved rules that "had some practical effect on the parties' rights, but each undeniably regulated only the process for enforcing those rights; none altered the rights themselves, the available remedies, or the rules of decision by which the court adjudicated either").

Even if this Court were to plunge into an *Erie* analysis and ultimately conclude the Act creates substantive rights, the Act could not apply in this Court because it sets forth a procedure for enforcing those substantive rights that preempts Federal Rules 12 and 56. *See Shady Grove*, 130 S.Ct. at 1443 (rejecting defendant's argument that "even if [the state law provision] is a procedural provision, it was enacted 'for *substantive reasons*,'" finding that "the substantive nature of [the state] law, or its substantive purpose, *makes no difference*. A Federal Rule of Civil Procedure is not valid in some jurisdictions and invalid in others—depending upon whether its effect is to frustrate a state substantive law (or a state procedural law enacted for substantive purposes)") (emphasis in original); *see also Boulter*, 842 F.Supp.2d at 108 ("Even assuming a substantive right is created, the Anti-SLAPP Act cannot apply in this Court because the D.C.

Council has clearly mandated the *procedure* for enforcing any such substantive rights that preempts Federal Rules 12 and 56.") (emphasis in original). The Washington legislature could have granted immunity that could be invoked through Rule 12 or Rule 56 motions, similar to the immunity the Act grants under Section 510. The legislature did not take this route, however, and has instead imposed upon plaintiffs a burden of proof heavier than prescribed by the federal rules and imposed upon the courts an obligation to make preliminary determinations on the merits based on materials outside of the pleadings in a manner that runs in direct conflict with Rule 12(d). Therefore, even if the Court were to find that the Act creates substantive rights, the procedural devices used to adjudicate those rights cannot apply to a federal court sitting in diversity.

Relying on *Godin* and *Lockheed*, various district courts, including courts in the Northern District of Illinois have concluded that procedural devices used to enforce immunity under to anti-SLAPP laws are not intended to be substitutes for the federal rules but rather "supplemental and substantive rule[s] to provide added protections, beyond those in Rule 12 and 56, to defendants who are named as parties because of constitutional [First Amendment] activities." *Trudeau*, 2011 WL 3898041, at *5 (quoting *Godin*, 629 F.3d at 88); *see also Sherrod v. Breitbart*, 843 F.Supp.2d 83, 85 n. 4 (D.D.C. 2012) (relying on *Godin* and *Lockheed* to conclude that D.C. Anti-SLAPP Act is substantive); *Farah v. Esquire Magazine, Inc.*, 863 F.Supp.2d 29, 36 n.10 (disagreeing with *Boulter* and citing *Godin* and *Lockheed* to find that D.C. Anti-SLAPP Act is applies to federal courts sitting in diversity); *Chi*, 787 F.Supp.2d at 808 (rejecting plaintiff's argument that ICPA is procedural and thus inapplicable in federal court, finding that although "the ICPA is located in the civil procedure chapter of the Illinois Compiled Statutes, its operative provisions are not merely procedural in nature [because they] create[] a new category

of conditional legal immunity against claims premised on a person's acts in furtherance of his First Amendment Rights"); *Global Relief*, 2002 WL 31045394, at *12 ("[T]he Ninth Circuit has expressly held that California's antiSLAPP statute is not preempted by the Federal Rules of Civil Procedure and is applicable in federal cases.") (citing *Lockheed*, 190 F.3d at 972-73).

Defendants urge that these decisions, along with *Godin* and *Lockheed*, place the *Boulter* court (and now this Court) in the minority with respect to the issue of whether anti-SLAPP provisions allowing preliminary motions to strike/dismiss conflict with the Federal Rules of Civil Procedure. While technically accurate, a closer reading of the contrary holdings reveals that Defendants' argument overstates the level of consensus on this issue. The district court holdings cited above rest primarily upon either *Godin*, with which the Court disagrees, *Lockheed*, which this court disagrees with and finds distinguishable, or previous district court decisions relying on either *Godin* or *Lockheed*.

District courts addressing the same question with respect to the Indiana anti-SLAPP statute have found no conflict between the statute and the Federal Rules of Civil Procedure because the Federal Rules, like the Indiana statute, "already require a court to treat a motion to dismiss as a motion for summary judgment when the motion to dismiss relies on matters outside the complaint." *Nixon v. Haag*, No. 1:08-cv-00648-LJM-JMS, 2009 WL 2026343, at *2 (S.D. Ind. July 7, 2009); *see also Containment Techs. Group*, 2009 WL 838549, at *8 (holding that Indiana anti-SLAPP law provisions "provid[ing] a complete defense to defamation and … the remedy of attorney fees" were "substantive provisions of Indiana law that govern in this diversity jurisdiction case," and noting the Indiana anti-SLAPP statute specifically required that the SLAPP defendant's motion be "treated as a motion for summary judgment"). The Court in *Containment Techs. Group* expressed concern that the "by a preponderance of the evidence"

burden of proof set forth in the statute may collide with the "no genuine issue of material fact" standard of Rule 56. *Id.* n.2. Ultimately, however, the court concluded that the two standards could "easily be reconciled" by framing the issue "as whether the undisputed facts show no genuine issue of material fact on the constitutional defense, which requires the defendant to be able to reach only the level of preponderance of the evidence." *Id.* As discussed above, it is this Court's view that the "clear and convincing evidence" burden imposed on plaintiffs under Washington law and the summary judgment standard cannot be reconciled.

Furthermore, not one of the cases cited by Defendants is binding on this Court. The decisions of other district courts, even those within the Seventh Circuit, are not authoritative or binding on this court. *See Townsel v. DISH Network, L.L.C.*, 668 F.3d 967, 970 (7th Cir. 2012) ("Yet district courts' decisions are not authoritative, even in the rendering district (other district judges may disagree). It takes an appellate decision to resolve a legal question….") (citation omitted). District courts often look to opinions of other district courts within their circuit not because decisions within the rendering district are thought to be more authoritative or better-reasoned but because courts within a particular district are more likely to engage in analyses driven by the same binding authority. As noted above, that is not the case here.

Furthermore, not one of the district court cases cited by Defendants looked to the history of Rule 12 or considered the Advisory Committee's notes to the 1946 amendments to determine whether, under *Shady Grove*, the Federal Rules of Civil Procedure answer the question in dispute. Instead, the courts reached their holdings by essentially doing exactly what *Shady Grove* advised against – diving into *Erie's* murky waters to determine whether the state law in question procedural or substantive without ever assessing in the first place whether the Federal Rules provide an answer to the question in dispute. *Shady Grove*, 130 S.Ct. at 1437 ("We do not

wade into *Erie*'s murky waters unless the federal rule is inapplicable or invalid."). And even if the *Erie* analysis in those cases were not premature, the Supreme Court made it clear in *Shady Grove* that "[t]he test is not whether the rule affects litigants' substantive rights; most procedure do. What matters is what the rule itself regulates: If it governs only the manner and means by which the litigants' rights are enforced, it is valid; if it alters the rules of decision by which the court will adjudicate those rights, it is not." *Shady Grove*, 130 S.Ct. at 1442 (internal citations and quotations omitted). Thus the district court decisions upon which Defendants rely, even on their own terms, do not compel a different result because the "substantive purpose [of the state law] *makes no difference*" for the purposes of determining whether that law is in conflict with the Federal Rules, as "it is not the substantive or procedural nature or purpose of the affected state law that matters, but the substantive or procedural nature of the Federal Rule." *Shady Grove*, 130 S.Ct. at 1444 (plurality).

Accordingly, because the contrary holdings are either distinguishable or rest upon analyses with which this Court disagrees, the Court declines to adopt their reasoning.

### 4. Policy Considerations

The Court recognizes that Section 525 was added to the Act to ensure "a procedural device to *quickly* halt any litigation found to be targeted at persons lawfully communicating on matters of public or government concern." *Phoenix Trading*, 2011 WL 3158416, at *5 (citing *Costello v. City of Seattle*, No. C10-1456MJP, 2010 WL 4857022, at *3 (W.D. Wash. Nov. 22, 2010)) (emphasis added); *see also* RCW 4.24.525, notes 2010 Ch. 118 (noting that the special motion to strike provision was added in order to protect from "the costs associated with defending [SLAPP] suits"). Because "the plaintiff's goals in a SLAPP are achieved through the ancillary effects of the lawsuit, not through an adjudication of the merits," Barker, 26 Loy. L.A.

38

L.Rev. at 406, Anti-SLAPP provisions serve the purpose of allowing for expedited judicial review to help protect defendants against such costs. The Court is aware that that this purpose will, to some degree, be frustrated by a finding that anti-SLAPP laws allowing preliminary adjudication on the merits are inapplicable in federal court.

The policy rationale behind Section 525, however, does not justify allowing preliminary determinations of the merits of a plaintiff's claim in a manner that directly contradicts the Federal Rules of Civil Procedure. The Supreme Court found similar concerns insufficient to warrant the opposite result in *Burlington Northern*, the case upon which the majority in *Shady Grove* relied. *See* 480 U.S. 1. In *Burlington Northern* the Court considered whether a federal court sitting in diversity must apply an Alabama statute that imposed a fixed penalty on appellants who obtained stays of judgment pending unsuccessful appeals. *Id.* The statute provided for mandatory damages in the amount of 10 percent of the trial court judgment anytime an appellant had sought to a stay of a monetary judgment pending appeal and the judgment was affirmed on appeal without substantial modification. *Id.* at 3-4. The impetus for the statute was similar to the purpose of anti-SLAPP laws – to penalize frivolous litigation and litigation interposed for delay and to provide additional damages to parties "for having to suffer the ordeal of defending" against such tactics *Id.* at 4. The Supreme Court held that the Alabama state statute could not apply in a federal diversity case because it conflicted with Federal Rule of Appellate Procedure 38, which provides that a court "may" award damages and costs to an appellee where it determines that an appeal is frivolous. *Id.*; Fed.R.App.P. 38. More recently, the Supreme Court rejected the suggestion that the Court "read the Federal Rules with sensitivity to important state interests and to avoid conflict with important state regulatory policies," finding that "[t]he search for state interests and policies that are 'important' is just as standardless as the

'important or substantial' criterion" the Court had previously rejected. *Shady Grove*, 130 S.Ct. at 1442, n. 7 (internal citations and quotations omitted).  Thus while this Court recognizes that one of the aims of Section 525—to avoid costly litigation through early adjudication on the merits— will be frustrated by the Court's holding today, the state of Washington's interests in shielding SLAPP defendants from such costs do not trump "Congress['s] … undoubted power to supplant state law, and undoubted power to prescribe rules for the courts it has created, so long as those rules regulate matters 'rationally capable of classification' as procedure." *Shady Grove*, 130 S.Ct. at 1442 (quoting *Hanna*, 380 U.S. at 472).

The Court is also fully aware that refusing to allow special motions to strike that would otherwise be permitted in state court may lead to forum shopping.  Defendants in state court will be able to impose upon plaintiffs Section 525's heightened standard of proof and force early adjudication on the merits.  The same defendant in federal court, under this Court's holding, will not be able to raise the standard of proof and "deal a deathly blow" to a plaintiff's case so early in the litigation. *Boulter*, 842 F.Supp.2d at 102.  Thus it is likely that the same case will take a different course depending on whether it is filed in state or federal court, thereby creating a potential breeding ground for forum shopping.

Such concerns, though real, do not compel the Court to reach the opposite result.  In *Shady Grove*, the Supreme Court addressed the forum shopping issue in this context after concluding that a New York class action statute could not apply to a federal court sitting in diversity due to its direct conflict with Rule 23:

> We must acknowledge the reality that keeping the federal-court door open to class actions that cannot proceed in state court will produce forum shopping.  That is unacceptable when it comes as a consequence of judge-made rules created to fill supposed "gaps" in positive federal law.  For where neither the Constitution, a treaty, nor a statute provides the rule of decision or authorizes a federal court to

supply one, "state law must govern because there can be no other law. *But divergence from state law, with the attendant consequence of forum shopping, is the inevitable (indeed, one might say the intended) result of a uniform system of federal procedure. Congress itself has created the possibility that the same case may follow a different course if filed in federal instead of state court. The short of the matter is that a Federal Rule governing procedure is valid whether or not it alters the outcome of the case in a way that induces forum shopping.* To hold otherwise would be to disembowel either the Constitution's grant of power over federal procedure or Congress's exercise of it.

*Shady Grove*, 130 S.Ct. at 1447-48 (emphasis added) (internal citations and quotations omitted).

Accordingly, as Section 525 is in direct conflict with the Federal Rules of Civil Procedure, which are not judge-made but enacted under the authority of Congress, the Court will not force a narrow construction of the Federal Rules in order to artificially reach a more harmonious result. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 66 (1991) ("[T]he Federal Rules of Civil Procedure are 'as binding as any statute duly enacted by Congress, and federal courts have no more discretion to disregard the Rules' mandate than they do to disregard constitutional or statutory provisions.' ") (quoting *Bank of Nova Scotia v. United States*, 487 U.S. 250, 255 (1988)).

## II.       BAN's Motion for Judgment on the Pleadings

Defendants next argue that Intercon's defamation and false light claims fail on the pleadings and should be stricken pursuant to Federal Rule of Civil Procedure 12(c). First, Defendants maintain that the Complaint demonstrates that BAN reached its opinion that Intercon exported e-Waste based on detailed evidence that BAN specifically identified and relied upon to form the basis of its belief. According to Defendants, such opinions are not actionable because they cannot be proven false. Second, Defendants submit that the Complaint demonstrates on its face that BAN did not act with actual malice, which, according to Defendants, is an element Intercon must prove in order to prevail on a false light and defamation claims.

Federal Rule of Civil Procedure permits a party to move for judgment on the pleadings

after the filing of a complaint and answer. *See Supreme Laundry Serv., L.L.C. v. Hartford Cas. Ins. Co.*, 521 F.3d 743, 746 (7th Cir. 2008). A motion under Rule 12(c) may be granted "only if it appears beyond a doubt that the plaintiff cannot prove any facts that would support his claim for relief." *Hayes v. City of Chicago*, 670 F.3d 810, 813 (7th Cir. 2012) (citing *Thomas v. Guardsmark, Inc.*, 381 F.3d 701, 704 (7th Cir. 2004)); *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997). In reviewing a 12(c) motion, the Court applies the same standard applied when reviewing a motion to dismiss under Rule 12(b)(6). *See Hayes*, 670 F.3d at 813 (citing *Piscotta v. Old Nat. Bancorp*, 499 F.3d 629, 633 (7th Cir. 2007)). The Court accepts as true all facts alleged in the Complaint and construes all reasonable inferences in favor of the non-moving party. *See Piscotta*, 499 F.3d at 633 (citing *Guardsmark*, 381 F.3d at 704); *Murphy v. Walker*, 51 F.3d 714, 717 (7th Cir. 1995). To properly state a valid claim, the complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). "Detailed factual allegations" are not required, but the plaintiff must allege facts that, when "accepted as true … 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). If the factual allegations are well-pleaded, the Court assumes their veracity and then turns to determine whether they plausibly give rise to an entitlement for relief. *See id.* at 679. A claim has facial plausibility when its factual content allows the Court to draw a reasonable inference that the defendant is liable for the misconduct alleged. *See id.* at 678.

"A plaintiff whose allegations show that there is an airtight defense has pleaded himself out of court, and the judge may dismiss the suit on the pleadings under Rule 12(c)." *Richards v. Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012). However, a complaint that invokes a recognized legal theory and contains plausible allegations on the material issues cannot be dismissed. *Id.*

(citing *Erickson v. Pardus*, 551 U.S. 89 (2007)).  In ruling on Rule 12(c) motion, the district court "should respect the norm that complaints need not anticipate or meet potential affirmative defenses.  If the facts are uncontested (or the defendants accept plaintiffs' allegation for the sake of argument), it may be possible to decide under Rule 12(c); if the parties do not agree, but one side cannot substantiate its position with admissible evidence, the court may grant summary judgment under Rule 56." *Id.*  For the purposes of Rule 12(c), the pleadings consist of the "complaint, the answer, and any written instruments attached as exhibits." *N. Ind. Gun Shows v. City of South Bend*, 163 F.3d 449, 452-53 (7th Cir. 1998).

### A.      Defamation

In order to state a claim for defamation under Illinois law, the plaintiff must set out sufficient facts to show (1) the defendants made a false statement concerning the plaintiff; (2) the statement was published to a third party; and (3) the publication of the false statement caused damage to the plaintiff. *See Krasinski v. United Parcel Serv., Inc.*, 530 N.E.2d 468, 471 (Ill. 1988).  The United States Constitution and Illinois law provide several defenses to a defamation claim, two of which are relevant here.  First, "statements of opinion, although defamatory, do not give rise to a defamation claim." *Giant Screen Sports v. Canadian Imperial Bank of Commerce*, 553 F.3d 527, 534 (7th Cir. 2009) (citing *Bryson v. News America Publications, Inc.*, 672 N.E.2d 1207, 1220 (Ill. 1996)).  A defamatory statement is protected under the First Amendment and rendered a non-actionable opinion only if the remark "cannot be reasonably interpreted as stating actual facts." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990); *Solaia Tech., LLC v. Specialty Publishing Co.*, 852 N.E.2d 825, 840 (Ill. 2006).  To determine whether a statement is a protected opinion, courts look to "whether the statement has a precise and readily understood meaning; whether the statement is verifiable; and whether the statement's literary or social

context signals that it has factual content." *Solaia Tech*, 852 N.E.2d at 840. "If it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable." *Giant Screen Sports*, 553 F.3d at 535 (citing *Wilkow v. Forbes*, 241 F.3d 552, 555 (7th Cir. 2001)). Furthermore, statements that contain "an objectively verifiable factual assertion" are actionable. *Id.* (citing *Lifton v. Bd. of Educ. of the City of Chicago*, 416 F.3d 571, 579 (7th Cir. 2005)). "Although 'in one sense all opinions imply facts, the question of whether a statement of opinion is actionable as defamatory is one of degree; the vaguer and more generalized the opinion, the more likely the opinion is non-actionable as a matter of law.' " *Id.* (quoting *Wynne v. Loyola Univ.*, 741 N.E.2d 669, 676 (Ill. 2000)). Second, public figures are subject to stricter defamation pleading requirements. *See New York Times v. Sullivan*, 376 U.S. 254, 279-80 (1964). A public figure can only recover in a libel action by showing the alleged defamatory statement was made with actual malice. *See id.* Actual malice refers to knowledge that the statement was false or reckless disregard as to whether the statement was false. *See id.*

Intercon's Complaint alleges that BAN and Puckett falsely published statements regarding Intercon to third parties and that it was harmed as a result of those statements. (Complaint, ¶¶ 7-29.) Accordingly, Intercon's Complaint sufficiently pleads the elements of defamation under Illinois law. Assuming for the purposes of this motion that Intercon is a public figure and that statements concerning "a recognized public" interest require a showing of actual malice under Illinois law, Intercon has sufficiently plead actual malice to survive Defendants' Motion. Intercon alleges that BAN improperly used Intercon's confidential information and conducted an "illicit investigation" in reaching its conclusions. (*Id.* ¶ 7.) Intercon further alleges that BAN knew or should have known that its investigation and audit of Intercon were flawed

and its accusations were false. (*Id.* ¶ 9.) Finally, Intercon alleges that BAN's actions were motivated by its desire to "create a false reputation as a crusader and ethical leader in the e-recycling industry" and "to increase enrollment in BAN's 'e-Stewards' certification program and increase its revenues." (*Id.* ¶ 2.) According to Intercon, these circumstances demonstrate that Puckett and BAN made the defamatory statements with "willfully and wantonly" and with "negligence and/or actual malice." (*Id.* ¶¶ 27-28, 33.) These assertions sufficiently allege actual malice.

Next, Defendants have not shown that their communications detailing Intercon's purported shipments of hazardous waste constitutes a non-actionable opinion. Defendants cannot convincingly maintain that its specific and detailed communications regarding Intercon "[could not] be reasonably interpreted as stating an actual fact." Nor is it plain that Defendants were expressing a subjective view, interpretation, theory, or conjecture. Rather, the statements that form the basis of Intercon's Complaint plainly indicate that Defendants claimed to be in possession of objectively verifiable facts. Furthermore, the statements contained in BAN's letter to Intercon, BAN's press release, and the Evidentiary report have "a precise and readily understood meaning," are "verifiable," and given their context, i.e., the fact that they are detailed in an evidentiary report published subsequent to a professional audit, "signal[] that [they have] factual content." *Solaia Tech*, 852 N.E.2d at 840. Lastly, the fact that the alleged communications at issue are prefaced with the word "may" or the phrase "has every reason to believe" does not render them non-actionable opinions. "Prefatory language does not control whether a statement is defamatory." *Giant Screen Sports*, 553 F.3d at 535 (Defendant's statements "not saved from being actionable as non-actionable opinion by the prefatory term, 'to [Defendant's] knowledge' "); *see also Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1227 (7th

Cir. 1993) (statements of fact not shielded from an action for defamation simply because they are prefaced with the words "in my opinion").

Accordingly, Defendants' Motion to Dismiss Intercon's defamation claims against BAN and Puckett is denied.

### B.    False Light

To state a claim for false light under Illinois law, Intercon must allege: (1) Defendants placed it in a false light before the public; (2) a trier of fact could find the false light "highly offensive to a reasonable person"; and (3) Defendants acted with actual malice. *See Pope v. Chronicle Pub. Co.*, 95 F.3d 607, 616 (7th Cir. 1996); *Kolegas v. Heftel Broad. Corp.*, 607 N.E.2d 201, 209 (Ill. 1992); *Moriarty v. Green*, 732 N.E.2d 730, 741 (Ill. App. Ct. 2000).  Under Illinois law, the defense of opinion applies equally to defamation and false light claims. *See Harte v. Chicago Council of Lawyers*, 581 N.E.2d 275, 280 (Ill. App. Ct. 1991); *Schaffer v. Zekman*, 554 N.E.2d 988, 993 n. 2 (Ill. App. Ct. 1991).

As to the first element, Intercon alleges that Defendants "made false public accusations that two containers parked on Intercon's premises contained hazardous e-Waste materials, that Intercon owned the supposedly hazardous e-Waste materials held within the containers, and that Intercon shipped the container with hazardous material to China and Hong Kong." (Complaint, ¶ 7.)  Intercon further alleges these statements are false because "[i]n reality, Intercon did not own the alleged hazardous e-Waste, did not ship the containers or any e-Waste to China or Hong Kong, and never shipped hazardous materials to China or Hong Kong." (*Id.* ¶ 8.)  Next, Intercon alleges these statements placed Intercon in a false light by accusing Intercon of improper business practices and criminal wrongdoing, and imputing to Intercon an inability to perform, a want of integrity in the discharge of its duties, and a lack of ability in its trade, profession or

business. (*Id.* ¶¶ 32, 36.) According to Intercon, this false light would be highly offensive to a reasonable person. (*Id.*) Lastly, as explained above, Intercon has sufficiently alleged that Defendants acted with actual malice. Thus the allegations in Intercon's Complaint set forth sufficient facts to withstand Defendants' motion to strike Intercon's false light claims.

Defendants may very well be correct in their assertions that BAN and Puckett's did not act with actual malice. However, at this stage of the proceedings, Intercon must simply set forth facts establishing that it is plausibly entitled to relief. *See Iqbal*, 556 U.S. at 678. It need not anticipatorily respond to defenses or demonstrate a likelihood of prevailing on the merits. *See Mitcheff*, 696 F.3d at 637. Defendants' Motion to Dismiss Intercon's false light claims pursuant to Rule 12(c) is therefore denied.

### III. Intercon's Motion to Strike Affirmative Defenses

Under Federal Rule of Civil Procedure 8(c), a party must set forth affirmative defenses in its responsive pleadings. Fed.R.Civ.P. 8(c). Because affirmative defenses are pleadings, they are subject to the pleading requirements of the Federal Rules of Civil Procedure. *See Heller Fin., Inc. v. Midwhey Powder Co., Inc.*, 883 F.2d 1286, 1294 (7th Cir. 1989); *see also Renalds v. S.R.G. Restaurant Group*, 119 F.Supp.2d 800, 802 (N.D. Ill. 2000) (citations omitted). Therefore, affirmative defenses must set forth a "short and plain statement" of the defense. *Household Fin. Serv., Inc. v. Northeastern Mortgage Inv. Corp.*, No. 00 C 0667, 2000 WL 816795, at *1 (N.D. Ill. June 22, 2000) (citing Fed.R.Civ.P. 8(a)); *see also* Fed.R.Civ.P. 8(b) ("In responding to a pleading, a party must state in short and plain terms its defenses to each claim asserted against it."). The Court evaluates a motion to strike affirmative defenses under Rule 12(f), which provides that on its own or on motion made by a party, "[t]he court may strike from a pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous

matter." Fed.R.Civ.P. 12(f). Although motions to strike are generally disfavored, courts should strike affirmative defenses that fail to meet basic pleading requirements, are clearly mistitled, or are redundant and add unnecessary clutter to a case. *See Heller*, 883 F.2d at 1295 (7th Cir. 1989); *see also United States v. 416.81 Acres of Land*, 514 F.2d 627, 631 (7th Cir. 1975). Furthermore, bare legal conclusions are never sufficient and must be stricken. *See Heller*, 883 F.2d at 1295 (granting motion to strike affirmative defenses where defendants omitted any short and plain statement of facts and failed to allege necessary elements of a claim).

Courts in this Circuit have applied a three-part test to determine whether to strike an affirmative defense. *See, e.g., Microthin.com, Inc. v. Siliconezone USA, LLC*, No. 06 1522, 2006 WL 3302825, at *9 (N.D. Ill. Nov. 14, 2006) (citing *Van Shouwen v. Connaught Corp.*, 782 F.Supp. 1240, 1245 (N.D. Ill. 1991)); *Renalds*, 119 F.Supp.2d at 802 (applying three-part test). First, the Court looks to whether the matter is properly pleaded as an affirmative defense. *See Renalds*, 119 F.Supp.2d at 802. Second, the court must determine whether the affirmative defense, as plead, complies with Rule 8(a). *See id* (citing *Heller*, 883 F.2d at 1294). Third, the court looks to whether the affirmative defense withstands a Rule 12(b)(6) challenge. *See id* (citing *Codest Eng'g Hyatt Int'l Corp.*, 954 F.Supp. 1224, 1228 (N.D. Ill. 1996) ("If an affirmative defense is insufficient on its face or comprises no more than 'bare bones conclusory allegations,' it must be stricken.")). Under Rule 12(b)(6), the court must accept all factual allegations as true and draw all reasonable inferences in favor of the pleader. If, when viewed in the light most favorable to the pleader, the allegation fails to state a claim upon which relief can be granted, the court must dismiss it. *See Gomez v. Illinois State Bd. of Educ.*, 811 F.2d 1030, 1039 (7th Cir. 1987).

In its Answer to Intercon's Complaint, BAN raises the following as affirmative defenses:

(1) the Court lacks personal jurisdiction over one or both defendants; (2) venue is inappropriate for one or both defendants;[16] (3) Intercon's Complaint is barred under Illinois's and Washington's anti-SLAPP ("Strategic Lawsuits Against Public Participation") statutes, as well as the First Amendment of the United States Constitution under the *Noerr-Pennington* doctrine; (4) Intercon's claims are barred under the doctrine of unclean hands because it has shielded its export of electronic and other waste through third parties and has mislead the public; and (5) all statements made by the Defendants that are the subject of Intercon's Complaint were substantially true, and thus cannot form the basis of a defamation claim. Intercon moves to strike and/or dismiss Defendants' first, second, and fourth affirmative defenses. The Court addresses each in turn.

### A.     First Affirmative Defense: Lack of Personal Jurisdiction

According to Defendants, the first affirmative defense of lack of personal jurisdiction is directed to the Court's jurisdiction over Puckett, the individual defendant in this case. Under the rules of pleading an affirmative defense, Defendants must assert facts that, if proved, would plausibly establish that this Court lacks personal jurisdiction over Puckett. Here, Defendants' First Affirmative Defense alleges that "James Puckett is a resident of Seattle, Washington" and that "[a]ll of the alleged defamatory comments at issue in Plaintiff's Complaint were made by BAN in Seattle, Washington." (Dkt. No. 22, ¶ 43.) Defendants further allege that "[a]ny statements attributed in the Complaint to Mr. Puckett are, according to the Complaint, alleged to have been made in Seattle, Washington, solely in his role as Executive Director of BAN." (*Id.*) Defendants also assert that "[t]he Complaint contains no allegations that defendant Puckett acted

---

[16] Defendants now concede that personal jurisdiction and venue are proper with respect to BAN, but maintain their affirmative defenses of lack of personal jurisdiction and improper venue with respect to Puckett. (Def. Resp. Brief, Dkt. 45, p. 3-4.)

in Illinois in his personal capacity or made any statements that are the subject of the Complaint in his personal capacity." (*Id.*)

A federal court sitting in diversity has personal jurisdiction over a party only if a court of the forum state would have jurisdiction. *See Daniel J. Hartwig Assoc's, Inc. v. Kanner*, 913 F.2d 1213, 1216 (7th Cir. 1990); *FMC Corp. v. Varonos*, 892 F.2d 1308, 1310 (7th Cir. 1990). Therefore, this Court has personal jurisdiction over Puckett only if an Illinois state court would have personal jurisdiction. In Illinois, a court may exercise jurisdiction over a defendant who is subject to the Illinois long arm statute. *See FMC*, 892 F.2d at 1310. Since its amendment in 1989, the Illinois long arm statute is coextensive with the limits of due process. *See FMC*, 892 F.2d at 1310 n. 5; *see also Tamburo*, 601 F.3d at 702 ("Without a viable federal claim, personal jurisdiction is determined under Illinois' long arm statute, which authorizes jurisdiction to the full extent permitted by the United States Constitution.") (citing 735 ILCS Comp. Stat. 5/2-209(c)); *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 715 (7th Cir. 2002) ("[T]here is no operative difference between the limits imposed by the Illinois Constitution and the federal limitations to personal jurisdiction."). The Seventh Circuit has ruled that specific personal jurisdiction, which is appropriate when the case or controversy "arises out of" the defendant's contacts with the forum state, *see Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n. 8 (1984); *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1277 (7th Cir. 1997), is appropriate where (1) the defendant has purposefully directed his activities at the forum state or purposefully availed himself of the privilege of conducting business in that state, and (2) the alleged injury arises out of the defendant's forum-related activities." *Tamburo v. Dworkin*, 601 F.3d 693, 702 (7th Cir. 2010) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)).

Taking the allegations contained in Defendants' First Affirmative Defense and assuming,

as the Court must, that they are true, Defendants could not plausibly establish that the Court lacks personal jurisdiction over Puckett in this matter. First, the fact that the statements in Intercon's Complaint that are attributed to Puckett were made from Seattle, by itself, does not allow Puckett to avoid personal jurisdiction in the Northern District of Illinois. Nor is it of any import that Puckett did not make the statements while physically within the state of Illinois. In a strikingly analogous case, the United States Supreme Court explained that where an employee is a "primary participant[] in an alleged wrongdoing intentionally directed at a … [resident of the forum State], … jurisdiction over [the employee] is proper on that basis" and does not violate Constitution. *Calder v. Jones*, 465 U.S. 783, 790 (1984). In *Calder*, the defendant employees were the authors and editors of an allegedly libelous article that appeared in a publication which had been distributed nationwide, including in the forum State where the plaintiff resided and conducted most of her business. *Id.* at 1486. The Court rejected the defendant employees' challenge to personal jurisdiction in the forum state, pointing out that the defendants "are not charged with mere untargeted negligence. Rather, their intentional, and allegedly tortuous, actions were expressly aimed at [the forum state]. [The defendant employees] wrote and … edited an article that they knew would have a potentially devastating impact upon [the plaintiff]. And they knew that the brunt of that injury would be felt by [the plaintiff] in the [forum State]…." *Id.* at 1487. Thus the Court held that "[u]nder the circumstances, [the defendants] must 'reasonably anticipate being haled into court there' to answer for the truth of the statements made in their article." *Id.* (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 559, 567 (1980)). Similarly, in *Tamburo*, the Seventh Circuit found that the district court had personal jurisdiction over defendants in a defamation case where defendants acted from outside the forum state because the "defendants specifically aimed their tortuous conduct at [the plaintiff] and his

business in Illinois with the knowledge that he lived, worked, and would suffer the 'brunt of the injury' there." 601 F.3d at 702. Therefore, in light of Intercon's allegations that Puckett made defamatory statements that were deliberately aimed at Intercon in Illinois, Puckett could not plausibly prevail on the affirmative defense of lack of personal jurisdiction based on his residency or location when the statements were made.

The remaining assertions in the Defendants' First Affirmative Defense are not so much factual allegations but recharacterizations of Intercon's Complaint. Specifically, the Defendants state that "[a]ny statements attributed in the Complaint to Mr. Puckett are, according to the Complaint, alleged to have been made … solely in his role as Executive Director of BAN. The Complaint contains no allegations that defendant Puckett acted in Illinois in his personal capacity or made any statements that are the subject of the Complaint in his personal capacity." (Dkt. 22, ¶ 43.) However, nowhere in Intercon's Complaint does it indicate that Puckett made the allegedly defamatory statements "solely" in his role as Executive Director of BAN. Furthermore, the Complaint does in fact contain factual allegations directed to Puckett that do not reference his role as BAN's Executive Director. Specifically, Intercon alleges that "Puckett stated in an obvious reference to Intercon that 'it is very sad that many e-Waste recycling companies continue to pose as responsible recyclers while they continue to export toxic waste ….. In this case, we can take some satisfaction that out [sic] e-Stewards Certification screening methods and audit caught what BAN has every reason to believe is a violator.' " (Dkt. 22, ¶ 16.) The Complaint further alleges that "Puckett falsely stated that one of Intercon's containers 'was known to contain hazardous waste.' … and Puckett's defamatory statements about Intercon continue to this day." (*Id.* ¶ 17.) Additionally, Counts II and IV of Intercon's Complaint, which are directed toward Puckett and not BAN, also contain allegations against Puckett that do not

mention his role as Executive Director of BAN. (*Id.* ¶ 25-28, 35-37)  In light of these allegations, the Defendants cannot fairly maintain that "[a]ny statements attributed in the Complaint to Mr. Puckett are, according to the Complaint, alleged to have been made … solely in [Puckett's] role as Executive Director of BAN."

Nor does the fiduciary shield doctrine, invoked by Defendants here, enable Puckett to prevail on the affirmative defense of lack of personal jurisdiction.  Under Illinois law, "if an individual has contact with a state only by virtue of his acts as the fiduciary of a corporation, he may be shielded from Illinois' exercise of jurisdiction over him personally on the basis of that conduct." *Olinski v. Duce*, 508 N.E.2d 398, 399 (Ill. App. Ct. 1987); *see also Rice v. Nova Biomedical Corp.*, 38 F.3d 909, 912 (7th Cir. 1994) ("This doctrine … denies personal jurisdiction over an individual whose presence and activity in the state in which the suit is brought were solely on behalf of his employer or other principal."); *Rollins v. Ellwood*, 565 N.E.2d 1302, 1314 (Ill. 1990) ("[T]he fiduciary shield doctrine prevents courts from asserting jurisdiction over a person on the basis of acts taken by that person not on his own behalf, but on behalf of his employer.").  While the non-resident's conduct may still subject him to personal liability, the same conduct does not necessarily permit the exercise of *in personam* jurisdiction over him. *See Olinski*, 508 N.E.2d at 399.  "The underpinning of this doctrine is that it is unfair to force an individual to defend a suit brought against him personally in a forum with which his only relevant contacts are acts performed not for his own benefit but for the benefit of his employer." *Washburn v. Becker*, 542 N.E.2d 764, 766 (Ill. App. Ct. 1989) (internal quotations omitted); *see also Rollins*, 565 N.E.2d at 1318 (explaining that where an individual's conduct "was the product of, and was motivated by, his employment situation and not his personal interests … it would be unfair to use this conduct to assert personal jurisdiction over him as an

individual").

Application of the fiduciary shield doctrine is discretionary. *See Washburn*, 542 N.E.2d at 766 (collecting and approving of federal cases finding the application of the fiduciary shield doctrine discretionary rather than mandatory, noting that "because the fiduciary shield doctrine has inherent equities which implicate the balancing of fairness, courts have refused to espouse a mechanical application of the doctrine"); *Farmer v. DirectSat USA*, No. 08-cv-3962, 2010 WL 380697, at *3 (N.D. Ill. Jan. 28, 2010) ("It is clear that the fiduciary shield doctrine is discretionary or equitable, rather than an absolute entitlement.") (citations omitted). In determining whether it is equitable to apply the doctrine, courts impose "two important limitations to the shield: (1) the shield is removed if the individual's personal interests motivated his actions; and (2) the shield generally does not apply when the individual's actions are discretionary." *Jones v. Sabis Educ. Sys., Inc.*, 52 F.Supp.2d 868, 883 (N.D. Ill. 1999) (citing *Rice*, 38 F.3d at 912; *Brujis v. Shaw*, 876 F.Supp. 975, 978 (N.D. Ill. 1995)). Courts generally agree that "the shield should not apply where the employee has the power to decide what is to be done and chooses to commit the acts that subject him to long-arm jurisdiction." *Brujis*, 876 F.Supp at 978 (collecting cases). Thus, with respect to the second limitations, courts have held that "discretionary action by the defendant alone is enough to negate the protection of the fiduciary shield." *Farmer*, 2010 WL 380697, at *3 (quoting *C.S.B. Commodities, Inc. v. Urban Trend (HK) Ltd.*, 626 F.Supp.2d 837, 868 (N.D. Ill. 2009)); *Minemyer v. R-Boc Representatives, Inc.*, No. 07 C 1763, 2007 WL 2461666, at *5 (N.D. Ill. 2007) ("[W]here a defendant acts with complete discretion over the actions giving rise to personal jurisdiction, the shield may be denied."); *Jones v. Sabis Educ. Sys. Inc.*, 52 F.Supp.2d 868, 884 (N.D. Ill. 1999) ("The shield generally should not apply where the employee has the power to decide what is to be done and

chooses to commit the acts that subject him to long-arm jurisdiction.") (internal quotations omitted). Additionally, "while an individual's position within the company is relevant to the 'discretionary' assessment, it is not dispositive." *Jones*, 52 F.Supp.2d at 868 (citing *Int'l Fin. Serv's Corp. v. Diddle Corp.*, No. 00 C 6433, 2002 WL 398513, at *5 (N.D. Ill. Mar. 14, 2002)).

In this case, Puckett has not denied that he was the Executive Director of BAN at the time the statements were made; nor do Defendants deny in their Answer or Response Brief that Puckett had discretion and control over Intercon's application for e-Stewards certification, the investigation of Intercon in Illinois, and the statements Puckett is alleged to have made about Intercon. Where a corporate officer has discretion to control the acts of the corporation, courts have found that it would be inequitable to apply the fiduciary shield doctrine. *See, e.g., Farmer*, 2010 WL 380697, at *4 (refusing to apply fiduciary shield doctrine because "the allegations in the Amended Complaint [were] sufficient to infer that each of the proposed individual defendants had significant discretion in their roles at [the defendant employer]."); *Fountain Mktg. Group, Inc. v. Franklin Progressive Res., Inc.*, No. 96 C 2647, 1996 WL 406633, at *4 (N.D. Ill. July 16, 1996) (refusing to allow president and chief operative officer to invoke fiduciary shield doctrine where the individual defendant and his wife owned 100% of the shares of the entity defendant); *R-Five, Inc. v. Sun Tui, Ltd.*, No. 94 C 4100, 1995 WL 548633, at *5 (N.D. Ill. Sept. 12, 1995) (fiduciary shield doctrine does not protect "an individual who is a high-ranking company officer or shareholder [who] has a direct financial stake in the company's health"). Therefore, even if the assertions in the Defendants' First Affirmative Defense reflected an accurate reading Intercon's Complaint, Puckett could not prevail on the affirmative defense of lack of personal jurisdiction under the fiduciary shield doctrine. Accordingly, Intercon's Motion to Strike Defendants' First Affirmative Defense is granted.

## B.     Second Affirmative Defense: Improper Venue

In diversity actions, venue is proper in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that that is the subject of the action is situated." 28 U.S.C. § 1391(b)(2). In their Second Affirmative Defense, Defendants once again assert that (1) Puckett is a resident of Seattle, Washington, (2) all of the alleged defamatory comments at issue were made by BAN in Seattle, (3) any statements attributed to Puckett are, according to Intercon's Complaint, said to have been made in Seattle and solely in Puckett's capacity as BAN's Executive Director, and (4) Puckett has taken no actions in his personal capacity in Illinois. Based on these assertions, the Defendants maintain that venue is improper with respect to Puckett.

As stated above, Intercon's Complaint contains factual allegations directed to Puckett individually and does not allege that Puckett defamatory statements "solely" in his role as Executive Director of BAN, the Complaint. Furthermore, the remaining allegations, assumed to be true, do not state a claim for improper venue that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The purpose of an affirmative defense is to "raise[] new facts and arguments that, if true, will defeat the plaintiff's or prosecution's claim, even if all allegations in the complaint are true." *JPMorgan Chase Bank, N.A. v. Mal Corp.*, No. 07 C 2034, 2009 WL 804049, at *1 (N.D. Ill. Mar. 26, 2009) (quoting Black's Law Dictionary 430 (7th ed. 1999)). Therefore, assuming a plaintiff has done its job in asserting the basis for venue in its Complaint, it is difficult for a defendant to plausibly assert that venue is improper in the form of an affirmative defense. *See Marina Bartashnik v. Bridgeview Bancorp, Inc.*, No. 05 C 2731, 2005 WL 3470315, at *5 (Dec. 15, 2005) ("The proper challenge to venue is a denial in the answer or a 12(b)(3) motion.")

(citations omitted).  Here, in light of Intercon's allegations that Puckett's defamatory statements were directed to Intercon in Illinois, Defendants' allegations regarding Puckett's residency and physical location when the statements were made are insufficient to state a plausible claim to relief for improper venue.  Accordingly, Intercon's Motion to Strike Defendants' Second Affirmative Defense is granted.

### C.     Fourth Affirmative Defense: Unclean Hands

Under Illinois law, the doctrine of unclean hands prevents a party from obtaining equitable relief if that party has itself has engaged in misconduct in connection with the subject matter of the litigation. *Wolfram Partnership, Ltd. v. LaSalle Nat'l Bank*, 765 N.E.2d 1012, 1024 (Ill. 2001); *Thomson Learning, Inc. v. Olympia Props., LLC*, 850 N.E.2d 314, 325 (Ill. App. Ct. 2006).  For the doctrine to apply, the party's misconduct must arise to the level of fraud or bad faith. *Beitner v. Marzahl*, 819 N.E.2d 1266, 1274 (Ill. 2004).  The purpose of the doctrine is to prevent a party from taking advantage of its own wrong. *See Regnery v. Meyers*, 803 N.E.2d 504, 685 (Ill. 2003).  General impropriety and misconduct that is not directed at the other party or that is tangential to the transaction at issue is insufficient to give rise to a defense under the doctrine of unclean hands. *See Rose v. Dolegjs*, 116 N.E.2d 402, 410 (Ill. 1953); *SEG Liquidation Co., LLC v. Stevenson*, No. 07 C 3456, 2008 WL 623626, at *4 (N.D. Ill. Mar. 6, 2008) (citing Illinois law).

In their Fourth Affirmative Defense, Defendants argue that Intercon should be barred from pursuing its Complaint under the doctrine of unclean hands.  According to Defendants, Intercon has failed to produce any evidence that BAN's allegedly defamatory statements were wrong and "has shielded its export of electronic and other waste through third parties and mislead the public, its customers and governmental authorities regarding its export of waste."

(Dkt. No. 22, ¶ 53.) These allegations, if true, plausibly support a claim to relief for Defendants under the doctrine of unclean hands. First, a claim that Intercon misled the public and the government regarding its shipments and export of waste constitutes an allegation that Intercon engaged in fraudulent conduct or acted in bad faith. Furthermore, the allegations are also connected to this litigation. If Intercon did in fact shield its export of electronic and other waste, thereby misleading the public, its customers, and governmental authorities, Defendants may plausibly be able to defeat Intercon's defamation claims under the doctrine of unclean hands based on a finding that Intercon is using this litigation to seek damages from the Defendants for defamation while at the same time attempting to conceal that the Defendants' allegedly defamatory statements might be true. Therefore, the Court finds that Defendants have properly alleged an affirmative defense of unclean hands. Accordingly, Intercon's Motion to Strike Defendants' Fourth Affirmative Defense is denied.

## IV. Intercon's Motion to Dismiss/Strike BAN's Counterclaim

Under the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, "[f]ederal courts have discretion to decline to hear a declaratory judgment action, even though it is within their jurisdiction." *Tempco Elec. Heater Corp. v. Omega Eng'g, Inc.*, 819 F.2d 746, 747 (7th Cir. 1987) (citations omitted). This is because on its face, the Declaratory Judgment Act confers discretion: a court "*may* declare the rights and other legal relations of any interested parties seeking such declaration." 28 U.S.C. § 2201(a) (emphasis added)). The Supreme Court has also described the Act as "an enabling Act, which confers a discretion upon courts rather than an absolute right upon the litigant." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 282 (1995). Thus, " 'there is … nothing automatic or obligatory about the assumption of jurisdiction by a federal court' to hear a declaratory judgment action." *Id.* at 288 (quoting E. Borchard, Declaratory

Judgments, 313 (2d ed. 1941)).  In determining whether to grant declaratory judgment, the court should consider matters of practicality and wise judicial administration. *Id.* at 288.

Where, as here, "the substantive suit would resolve the issues raised by the declaratory judgment action, the declaratory judgment action 'serves no useful purpose' because the controversy has 'ripened' and the uncertainty and anticipation of litigation are alleviated." *Amari v. Radio Spirits, Inc.*, 219 F.Supp.2d 942, 944 (N.D. Ill. 2002) (quoting *Tempco*, 819 F.2d at 749).  Thus courts routinely dismiss counterclaims that seek to generate an independent piece of litigation out of issues that are already before the court; this includes counterclaims that merely restate an affirmative defense, as well as those which simply seek the opposite effect of the complaint. *See, e.g., Lincoln Nat'l Corp. v. Steadfast Ins. Co.*, No. 1:06-CV-00058, 2006 WL 1660591, at *4 (N.D. Ind. June 9, 2006) (striking counterclaim seeking declaratory judgment because it "raise[d] the same issues as [the counterclaimant's] affirmative defenses" and thus "pursue[d] issues already being litigated in [the Plaintiff's] Complaint and [the counterclaimant's] Answer and affirmative defenses"); *U.S. v. Zanfei*, 353 F.Supp.2d 962, 965 (N.D. Ill. 2005) (finding counterclaim for declaratory judgment repetitious and unnecessary because it merely restated an issue already before the court); *Dixie Gas & Food, Inc. v. Shell Oil Co.*, No. 03 C 8210, 2005 WL 1273273, at *7 (N.D. Ill. May 25, 2005) (finding declaratory judgment claim asserted by plaintiff redundant because determination of the issues raised therein was already under way based on the other counts in the plaintiff's complaint); *In re Messina*, No. 99B29371, 2003 WL 22271522, at *8 (Bankr.N.D.Ill. Sept. 29, 2003) (dismissing counterclaim seeking declaratory judgment that was "merely the opposite" of claims raised in the complaint); *Amari*, 219 F.Supp.2d at 944 ("All of the issues in the declaratory judgment claim will be resolved by the substantive action, so the declaratory judgment serves no purpose."); *see also*

*Tenneco, Inc. v. Saxony Bar & Tube, Inc.*, 776 F.2d 1375, 1379 (7th Cir. 1985) ("The label 'counterclaim' has no magic. What is really an answer or defense to a suit does not become an independent piece of litigation because of its label."). Thus "[w]hen the original complaint puts in play all of the factual and legal theories, it makes no difference whether another party calls its pleadings counterclaims, affirmative defenses, or anything else … [because] the parties to the complaint are parties to each aspect of the imbroglio." *Tenneco*, 776 F.2d at 1379.

Here, BAN alleges in its counterclaim for declaratory relief that "its "status as a credible certifying organization has been harmed and threatened by [Intercon's] assertions about the accuracy of BAN's Evidentiary Report and decision to deny [Intercon] e-Stewards certification." (Def. Ctcl, ¶ 8.) BAN further alleges that Intercon has engaged in a campaign to undermine BAN's credibility in the recycling community. (*Id.*) Based on these allegations, BAN seeks a declaration, pursuant to 28 U.S.C. § 2201, that Intercon "exports waste to China, contrary to its representations to the public, and that BAN's decision to deny e-Stewards certification to [Intercon] was justified." (*Id.*)

There is significant overlap between the issues raised collectively in Intercon's Complaint and Defendants' affirmative defenses, and those raised in BAN's Counterclaim. Intercon's Complaint alleges that the Defendants defamed it by making false statements pertaining to supposed shipment of two containers of hazardous e-Waste. Defendants assert in their Fifth Affirmative Defense that any statements they made regarding Intercon were substantially true and therefore cannot form the basis for a defamation claim. (Def. Answer, ¶ 54.) Defendants also state in their Fourth Affirmative Defense that Intercon "has shielded its export of electronic and other waste through third parties and has misled the public, its customers, and governmental authorities regarding its export of waste." (*Id.* ¶ 53.) Based on

these allegations, the issues raised in BAN's Counterclaim – (1) whether Intercon exports waste to China, (2) whether Intercon made contrary representations to the public, and (3) whether BAN's decision to deny e-Stewards certification to Intercon was justified – will be resolved via litigation of Intercon's Complaint and Defendants' fourth and fifth affirmative defenses, regardless of whether BAN's counterclaim is allowed to proceed.

Defendants maintain that the issues presented in BAN's claim for declaratory relief are broader than the issues that would be resolved through litigating Intercon's Complaint because they implicate misrepresentations made by Intercon to the government as well as to the public and because they concern Intercon's shipment of all types of waste, not e-Waste exclusively. Even a generous reading of the pleadings (from Defendants' perspective) suggests otherwise. First, BAN's counterclaim is bereft of any allegations pertaining to Intercon's alleged misrepresentations to the government. Second, Defendants have already alleged in their Fourth Affirmative Defense that "[Intercon] has shielded its export of electronic *and other waste* through third parties and has *misled the public*." (Def. Answer, ¶ 53.) (emphasis added). Thus to the extent BAN's Counterclaim implicates other types of waste and alleged misrepresentations made by Intercon to the public, those issues will be resolved through litigating BAN's Fourth Affirmative Defense. Also, insofar as Defendants' seek to use the Declaratory Judgment Act to expand the scope of this litigation by implicating other shipments and other types of waste that are not the subject of Intercon's Complaint or any of its claims, the counterclaim fails to allege an actual controversy. The purpose of the Declaratory Judgment Act was initially intended to allow for an alternative to federal injunctions in cases where a party sought to challenge the constitutionality of a statute without having to violate the statute, and now serves to allow courts to facilitate efficient outcomes by declaring the rights of adverse parties before they accrue

avoidable damages. *See Steffel v. Thompson*, 415 U.S. 452, 466 (1974); *Medical Assur. Co., Inc. v. Hellman*, 610 F.3d 371, 381 (7th Cir. 2010); *Cunningham Bros., Inc. v. Bail*, 407 F.2d 1165, 1167–68 (7th Cir. 1969). It was not intended to allow parties to convert claims and affirmative defenses into redundant counterclaims. Given the allegations in the Complaint and in light of Defendants' Fourth and Fifth affirmative defenses, a separate declaratory judgment action is not necessary to resolve the issues set forth in BAN's Counterclaim.

Furthermore, even if BAN's Counterclaim were not redundant in light of the issues already before this Court, the Counterclaim does not survive Intercon's Motion to Dismiss pursuant to Rule 12(b)(6). The legal standard for a motion to dismiss a counterclaim is the same as the standard applied to a motion to dismiss a complaint. *See Cozzi Iron & Metal, Inc. v. U.S. Office Equipment, Inc.*, 250 F.3d 570, 574 (7th Cir. 2001). Therefore, in order to survive Intercon's Motion to Dismiss, BAN would have to allege facts that, if true, "plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679. In this case, BAN's counterclaim contains little more than a few conclusory allegations and fails to allege any facts that would enable the court to draw a reasonable inference that it is entitled to the declaration it seeks. Where, as here, a claimant simply recites the statutory elements of a cause of action, dismissal is appropriate. Accordingly, Intercon's Motion to Dismiss BAN's counterclaim for declaratory relief is granted.

## CONCLUSION

For the reasons stated herein, Defendants' Special Motion to Strike pursuant to RCW 4.24.525 and Motion for Judgment on the Pleadings are denied. Defendants' Motion to Dismiss pursuant to RCW 4.24.510 is granted to the extent Intercon's claims against Defendants arise from alleged communications made to the Illinois Environmental Protection Agency and the U.S. Environmental Protection Agency, and denied with respect to any alleged communications

made to nongovernmental entities.  Intercon's Motions to Strike Defendants' First and Second Affirmative Defenses and to Dismiss BAN's Counterclaim are granted.  Intercon's Motion to Strike Defendants' Fourth Affirmative Defense is denied.


_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date:  August 28, 2013